*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────



ABDUL AWKAL,

　　　　　*Petitioner-Appellant,*

　　　*v.*

BETTY MITCHELL, Warden,

　　　　　*Respondent-Appellee.*

No. 01-4278

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00252—Donald C. Nugent, District Judge.

Argued: December 2, 2009

Decided and Filed: July 23, 2010

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.[*]

　　　　GILMAN, J., delivered the opinion of the court, in which BATCHELDER, C.J., BOGGS, GIBBONS, ROGERS, SUTTON, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, JJ., joined, with WHITE, J. (p. 26), also delivering a separate concurring opinion. MARTIN, J. (pp. 27-40), delivered a separate dissenting opinion, in which MOORE, COLE, and CLAY, JJ., joined.

───────────────

## COUNSEL

**ARGUED:** R. Brian Moriarty, Cleveland, Ohio, for Appellant. Benjamin C. Mizer, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Kevin M. Cafferkey, Thomas F. O'Malley, Jr., LAW OFFICES, Cleveland, Ohio, for Appellant. Benjamin C. Mizer, David M. Lieberman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

[*]Judge Cook recused herself from participation in this case.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  Abdul Awkal was convicted by an Ohio jury on two counts of aggravated murder for the shooting deaths of his wife and brother-in-law in 1992.  The jury recommended a sentence of death, and the trial court sentenced Awkal accordingly.  Awkal now appeals the district court's denial of his petition for a writ of habeas corpus.

In his petition, Awkal argues that (1) his counsel was ineffective at the guilt phase of his trial for calling a psychiatrist who directly contradicted the defense's theory of not guilty by reason of insanity, (2) his counsel was ineffective at the penalty phase for failing to introduce records of his previous involuntary hospitalization and for failing to present testimony of competent mental health experts, and (3) the prosecutor's statement in closing argument about Awkal's being able to "walk out the door" if found not guilty by reason of insanity was prosecutorial misconduct.  For the reasons set forth below, we **AFFIRM** the judgment of the district court in denying Awkal's petition for habeas relief.

## I.  BACKGROUND

In affirming both Awkal's murder conviction and death sentence on direct appeal, the Supreme Court of Ohio provided a thorough description of the relevant facts and subsequent trial:

> On January 7, 1992 . . . Abdul Hamin Awkal, shot and killed his estranged wife, Latife Awkal, and his brother-in-law, Mahmoud Abdul-Aziz, at the Family Conciliation Services Department of the Cuyahoga Domestic Relations Court. [Awkal] was captured in the courthouse basement not far from where the shooting took place.
>
> Awkal arrived in the United States from Lebanon about 1984, when he was twenty-four. He lived with family members in Detroit, Michigan, and worked as a dishwasher and gas station attendant. In 1985, Awkal suffered a mental breakdown at the gas station after he believed he had been accused of theft by his employer. He became hysterical, cursing and

breaking things, vomited and then collapsed. He was taken to Detroit Medical Center in a straitjacket. Awkal was apparently released into his brother's custody later that same day, but disregarded instructions to follow up with a psychiatrist.

Later, Awkal began working at a General Motors factory in Michigan. He was eventually transferred to the Chevrolet plant in Parma, Ohio. He had difficulty sleeping during this period, and was prescribed medication to help him sleep.

Awkal's family arranged for him to meet his wife, Latife, after his arrival in Cleveland. This type of arranged marriage was common in his Islamic faith. Awkal's need for sleeping pills diminished after he met his wife. Awkal and Latife were married under Islamic law in March 1989 and under Ohio law in April 1989. Later in 1989, Awkal went to Cleveland Metropolitan General Hospital complaining of numbness down his side. Although Awkal was again told to talk to a psychiatrist, he never did so. Awkal and Latife had a daughter, Zaynab, born in September 1990.

On their honeymoon, Latife told Awkal she did not love him, but that she understood that love would follow. He unsuccessfully attempted to improve their relationship by opening a bank account for her, teaching her to drive, encouraging her to attend school, and helping her parents with various household tasks.

Latife and her brothers felt that Awkal was not a good Muslim. Awkal did not spend sufficient time in daily prayer and he enjoyed music and celebrating Christian holidays, such as Christmas. Latife and her brothers did not listen to music, or celebrate Christian holidays, and prayed five or six times a day. Latife's brother, Mahmoud Abdul-Aziz, tried to teach Awkal the tenets of their family's Islamic faith, but Awkal viewed Mahmoud's actions as interference with his freedom, and believed that he was harassed and threatened by Mahmoud because of his religious beliefs.

Awkal's marital life was dissolving. Latife spent many nights away from Awkal and eventually asked for an Islamic divorce. According to Awkal, a Muslim husband may divorce his wife merely by telling her, "I divorce you, I divorce you, I divorce you." Awkal granted her request on October 13, 1991, but then Latife agreed to remarry him under Islamic law. Latife felt that she had been shamed and that her baby had been made illegitimate by the divorce.

On October 16, 1991, Latife found out that she had contracted a venereal disease from Awkal. The next day, Latife moved out of the marital home, moved in with Mahmoud, and started divorce proceedings. A divorce complaint and motions for spousal support, child support, visitation and

restraining orders were filed in October 1991. Latife talked of returning to Lebanon with the baby.

Awkal was hurt by his family problems and sought counseling, but declined medication. Awkal had counseling sessions four times in November 1991, because he was depressed and suicidal. These feelings were brought on by the divorce and Awkal's belief that Latife's brothers and their religion had interfered with his life and his marriage. Awkal's psychological records reflect that he was very angry with Latife and her brothers because of the divorce.

On November 8, 1991, Awkal bought a nine-millimeter semi-automatic pistol, allegedly to defend himself from Latife's brothers. The evening of that same day and the morning of the next, Awkal called Latife and her brother, Omar Abdul-Aziz, threatening to kill her and her entire family if the divorce was not dismissed. Latife reported the call to her divorce attorney, who sent a letter to Awkal's attorney regarding the threats.

Awkal attended hearings in his divorce case on December 10, 17, and 19, 1991, without incident. During this period, Awkal and Latife agreed to a child visitation schedule and temporary child and spousal support. At Latife's insistence, the visitation order prohibited Awkal from participating in any Christmas-related activities with the baby during his visitation. Awkal also agreed that the family checking accounts, containing approximately $4,800, which had been frozen by the domestic relations court, were to be equally divided between Latife and Awkal.

A meeting was scheduled for 2:00 p.m. on January 7, 1992, at the Family Conciliation Services Department, Room 52, located in the basement of the old Cleveland courthouse. Latife came early to the meeting with her brother, Mahmoud, and her baby. They waited in the hall outside for Awkal to arrive.

Awkal arrived at the courthouse parking garage at 1:48 p.m. from Michigan, where he had spent the weekend with relatives. On his person were copies of the baby's medical records, which had been checked out from the treating HMO over a month earlier, and numerous childcare supplies, including diapers, baby food, and clothing. Prior to the meeting, Awkal wrote a check to his brother for nearly the entire contents of the frozen checking accounts, and changed his address at the post office to his brother's house in Michigan.

Awkal confronted Mahmoud and Latife in the hallway at approximately 2:00 p.m. No harsh words or raised voices were heard from the hall before the shooting. However, "panicky" voices were heard immediately before the three entered Room 52. Awkal chased Latife and Mahmoud

into the room, where he shot his wife and her brother at close range. Five shell casings were found inside the room; one shell casing was found in the hall outside the room.

Awkal then picked up the baby from the bench outside the room and walked quickly through the basement halls of the courthouse with her in his arms. Several armed deputies confronted Awkal in the hallway. Awkal pointed his gun at his head and then at his daughter's head, threatening to kill her and then himself. Awkal vowed that nobody was going to take his baby.

When a deputy tried to grab Awkal's gun, Awkal backed further down the hall with the baby. While proceeding down the hall, Awkal was confronted by another deputy, who attempted to disarm Awkal. Awkal evaded this attempt, but was shot in the back while trying to escape.

When Awkal was taken into custody, his pistol was cocked, ready to fire, and contained six live rounds (one in the chamber; five in the magazine). Awkal also had another magazine containing thirteen rounds of live ammunition in his coat pocket. The bullets retrieved from Mahmoud's body and from Room 52 were fired from Awkal's gun.

At the hospital the next day, Awkal, after being advised of his *Miranda* rights, told police that he had confronted Mahmoud in the hallway and demanded that Mahmoud "profess that Allah was the only God." When Mahmoud did not do so, Awkal shot the victims. Awkal stated that he thought that he had shot himself.

Awkal was indicted on two counts of aggravated murder with prior calculation and design, including the multiple-murder death penalty specification. He was also indicted on two counts of felonious assault, including a firearm specification. Awkal pled "not guilty" and "not guilty by reason of insanity" to the charges against him.

While awaiting evaluation by a court-appointed psychiatrist to determine whether he was sane and competent to stand trial, Awkal reportedly had hallucinations involving his wife, who spoke to him and told him to join her. Two psychiatrists had examined Awkal at the county jail and found him to be depressed and angry. Awkal was prescribed anti-depressant and anti-anxiety drugs. These drugs did not stop him from having the hallucinations, and he was prescribed different anti-psychotic and anti-depressant medications.

Awkal was found sane at the time of the murders in the preliminary sanity report. However, the severity of his depression rendered him incapable of aiding with his defense, and the trial court found Awkal not competent to stand trial. He was ordered to the Dayton Mental Health Center, Forensic Unit, for treatment and further evaluation. During his

stay in Dayton, Awkal continued to receive anti-psychotic medication, but at greater levels. He was also placed on anti-depressant and anti-anxiety medications. On September 3, 1992, the trial court found Awkal competent to stand trial, but returned him to Dayton for further treatment until the trial started.

In October 1992, a jury was impaneled. During the trial, defense counsel complained to the court that Awkal's condition had deteriorated and suggested that a new competency evaluation be undertaken. The trial court refused to have Awkal reevaluated, but stated that it would watch Awkal closely to see that he was paying attention to the trial and helping with his own defense. After the state closed its case in chief, the trial court dismissed one of the felonious assault charges.

Several witnesses testified on Awkal's behalf during the guilt phase. Dr. Paul E. Hewitt, a psychologist, was called to give an opinion on the issue of prior calculation and design. However, when the court learned that Dr. Hewitt was not a licensed psychologist in Ohio, his testimony was stricken from the record. Dr. Magdi S. Rizk, the psychiatrist who conducted Awkal's pretrial sanity and competency evaluations, testified that Awkal was sane at the time of the murders. Finally, Dr. Eileen S. McGee, a psychiatrist awaiting board certification, testified that Awkal was insane at the time of the shooting, that he did not know what he did was wrong, and that Latife and Mahmoud had provoked the incident.

Awkal testified on his own behalf. He stated that Mahmoud and Latife's other brothers were religious fanatics, and had harassed him and interfered in his life. Awkal testified that he purchased the gun to protect himself from Latife's brothers, who had threatened him and, on one occasion, forced him to kneel down before them, swearing allegiance to their religious sect. He denied threatening Latife or her brother.

Awkal stated that on the morning in question he met Latife in the hallway of the courthouse, and asked her to come back to him. She refused, and he went back to his car to get his gun, intending to kill himself in front of Latife to make her regret her decision to divorce him. When Awkal returned he asked Latife if he could hug his daughter one last time. Latife agreed, but Mahmoud confronted Awkal, stating that the baby was not Awkal's, and that Awkal would never see her again. Awkal testified that Mahmoud's face "turn[ed] into that of a monster" and that the walls then collapsed. The next thing Awkal knew, he awoke in the hospital.

On rebuttal, the prosecution presented Dr. Edward Dutton, a forensic psychiatrist, who testified that Awkal was malingering, that he understood what he had done was wrong, and that he had acted out of anger.

The jury found Awkal guilty as charged on the aggravated murder charges, but not guilty on the remaining felonious assault charge.

Several witnesses, including Drs. Paul Hewitt, Eileen McGee, and Salah Samy, testified on Awkal's behalf during the penalty phase. Dr. Hewitt testified that Awkal's problems were part of a life-long anxiety problem, and believed that Mahmoud's threats and religious fanaticism were extremely strong provocation and had facilitated the shooting. Dr. Hewitt believed that Awkal's reaction was spontaneous and that he did not have the ability to conform his conduct to the requirements of Ohio law when he committed the murders.

Dr. McGee testified that the religious interference of Mahmoud and his brothers was a strong provoking force in the murders. Dr. McGee also testified that Awkal's reaction was triggered by Mahmoud's provocation, and that Awkal did not have the ability to conform his conduct to the requirements of the law of Ohio when the murders occurred.

Dr. Samy, Awkal's treating psychiatrist in Dayton, testified that Awkal was not malingering, and that he lost his judgment and control and awareness of what he was doing just prior to the murders. Dr. Samy testified that Awkal was not sane at the time of the murders. Dr. Samy also believed that Latife and Mahmoud facilitated the incident.

Awkal gave an unsworn statement, in which he explained his childhood situation, his religious problems with his brothers-in-law, and how these religious problems caused his marital problems. He also talked about how after Mahmoud's face became that of a monster, the walls collapsed down upon him. The next thing Awkal knew, he woke up in the hospital.

The prosecution rebutted this testimony with Dr. Edward Dutton, who believed that Awkal was malingering.

The jury found Awkal guilty of the aggravated murder charges and recommended death. The trial court agreed and imposed the death penalty. The court of appeals affirmed the decision of the trial court.

*State v. Awkal*, 667 N.E.2d 960, 963-66 (Ohio 1996).

After the Supreme Court of Ohio affirmed Awkal's conviction and sentence on direct appeal, *id.* at 966-73, the U.S. Supreme Court denied certiorari, *Awkal v. Ohio*, 519 U.S. 1095 (1997). The Ohio state courts subsequently denied Awkal's petition for post-conviction relief. *State v. Awkal*, No. 73267, 1998 WL 827585 (Ohio Ct. App. Nov. 25, 1998); *State v. Awkal*, 708 N.E.2d 209 (Ohio 1999).

In March 2000, Awkal filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Ohio, raising 22 grounds for relief.  The district court denied Awkal's petition and further determined that there was no basis to grant a certificate of appealability.  This court ultimately granted a certificate of appealability on his claims of ineffective assistance of counsel regarding the selection and testimony of mental health experts at the guilt and penalty phases of his trial, as well as for a claim of prosecutorial misconduct arising from the prosecutor's closing argument.

## II.  STANDARD OF REVIEW

Our review of the district court's decision to dismiss Awkal's § 2254 petition is de novo, but we review any factual findings by the court under the clear-error standard. *See Sherwood v. Prelesnik*, 579 F.3d 581, 584 (6th Cir. 2009) (citation omitted).  Awkal filed his habeas petition in March 2000, so we review the findings of the Ohio state courts under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Willams v. Taylor*, 529 U.S. 362, 411 (2000).  This burden is a

demanding one.  A state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

## III.   INEFFECTIVE ASSISTANCE DURING THE GUILT PHASE

In order to establish the ineffective assistance of counsel, Awkal must first show that his "counsel's representation fell below an objective standard of reasonableness." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Second, Awkal must establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  This too is a high burden to meet:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id*. at 689 (internal citations and quotation marks omitted).

Applying the *Strickland* standard, the Supreme Court of Ohio rejected Awkal's contention that his counsel was ineffective regarding the presentation of mental health experts during the guilt phase of the trial:

> Counsel called Dr. Hewitt as an expert witness to testify during the guilt phase on the issue of prior calculation and design. . . .  Trial counsel knew of Dr. Hewitt's lack of qualifications before he called Dr. Hewitt

to the stand.  Counsel made a tactical decision to try to get Dr. Hewitt's testimony into evidence.  He failed.  This was not a good tactical decision, but it does not rise to the level of ineffective assistance of counsel.

Counsel also called Dr. Rizk to testify during the guilt phase.  Dr. Rizk is adequately qualified and has testified in numerous other similar circumstances.  However, Dr. Rizk testified that Awkal was sane at the time of the murders.  This testimony obviously damaged Awkal's affirmative defense that he was not sane when he committed the murders.  Yet, portions of Dr. Rizk's testimony assisted the defense, including testimony about religion as a basis for Awkal's marital problems, his medication levels, and his hallucinations.

Counsel concluded Awkal's affirmative defense by calling Dr. McGee, a psychiatrist. Dr. McGee was not yet board certified in psychiatry, had no experience in forensic psychiatry, and had been practicing psychiatry for only one year.  Dr. McGee testified that Awkal, as evidenced by his hallucinations involving his wife in his cell in Dayton, had broken with reality at the time of the murders. . . .  Although her opinion may have been diminished by her lack of certification and inexperience, Dr. McGee supported Awkal's affirmative defense.

Thus, of the three doctors called to testify for the defense, the testimony of one was stricken from the record, one gave an opinion contradicting Awkal's affirmative defense but also gave other evidence that assisted that defense, and one testified that Awkal was not mentally responsible for his acts.

Awkal's counsel obviously had some plan in mind.  Dr. Hewitt conceivably could have been allowed to testify as an expert witness, and Dr. Rizk did make an earlier finding that Awkal was incompetent to stand trial.  In hindsight it appears that Awkal may have been better served to call only Dr. McGee during the guilt phase, and call her and the other defense doctors during the penalty phase, if the trial would reach that stage.  However, the end result of tactical trial decisions need not be positive in order for counsel to be considered "effective."

*State v. Awkal*, 667 N.E.2d 960, 971-72 (Ohio 1996).

## A.      Alleged deficient representation

Awkal argues that he has satisfied the first *Strickland* requirement because Dr. Rizk's testimony "destroy[ed] any chance Awkal had for being found not guilty by reason of insanity."  But Dr. Rizk's damaging testimony must be viewed in the context

of the overall trial circumstances and in light of the two other expert witnesses presented by defense counsel during the guilt phase of the trial. Even though the trial court struck the testimony of the first witness, Dr. Paul Hewitt, upon learning that he was not a licensed psychologist in Ohio, Dr. Hewitt was allowed to testify later at the penalty phase of the case. And prior to the striking of his testimony, counsel elicited favorable testimony from Dr. Hewitt about Awkal's unhappy family life and the physical abuse by his father. According to defense counsel, Dr. Hewitt would have continued on to opine (if he had been permitted to do so) that Awkal had a history of depression and that, on the day of the shooting, he "exploded" and had a sudden fit of rage.

Although Dr. Hewitt's testimony was ultimately not allowed at the guilt phase of the trial, he had qualifications sufficient to opine on Awkal's mental state, including a bachelor's, master's, and Ph.D. in psychology. Dr. Hewitt was the director of a company that contracted with various agencies, including the Federal Probation Department, the Internal Revenue Service, and the Ohio Department of Mental Health and Development Disabilities, to do psychological evaluations, mental status reports, and testing of prisoners set for presentence release. And Dr. Hewitt had met with Awkal three times.

Moreover, the Supreme Court of Ohio stated on direct review that the trial court had the discretion to *permit* Dr. Hewitt's testimony. Indeed, the Court recognized that "Dr. Hewitt had experience that may have been helpful to the jury." *State v. Awkal*, 667 N.E.2d 960, 968 (Ohio 1996). The Court's opinion further indicates that there was no hard and fast rule clearly barring Dr. Hewitt from testifying, even though it ultimately found that the trial court did not abuse its discretion in prohibiting the testimony. So given Dr. Hewitt's qualifications and the lack of a rule automatically barring him from testifying, we find no fault with defense counsel's attempt to present him as an expert witness during the guilt phase.

Dr. Magdi Rizk testified next. On direct examination by defense counsel, Dr. Rizk informed the jury that Awkal had previously been found incompetent to stand trial. The doctor also testified about the religious friction that permeated Awkal's interactions

with his wife and her brothers. Dr. Rizk's testimony on direct examination was favorable to Awkal. But, on cross-examination by the prosecutor, Dr. Rizk contradicted the defense's insanity theory when he testified that, in his opinion, Awkal was sane at the time of the killings.

Finally, Dr. Eileen McGee testified. After Dr. McGee graduated medical school and completed a two-year residency in pediatrics, she was a practicing pediatrician for five years. She then completed four years of additional medical training focused solely on psychiatry, and two of these years were focused on adult psychiatry. She belonged to numerous psychiatric professional organizations. At the time of the trial, Dr. McGee had closed her pediatric practice, had passed the written test to become board-certified in psychiatry, was awaiting the results of the oral examination, and had been practicing psychiatric medicine for over a year. She testified that seventy percent of her current patients were adults.

After discussing her qualifications, Dr. McGee opined that Awkal was insane at the time of the shootings and had no way of understanding that his actions were wrong. Dr. McGee was also of the opinion that Latife and Mahmoud had provoked the incident. Her testimony unambiguously supported the defense's insanity theory. Thus, counsel did not simply put Dr. Rizk on the stand, attempt to get a bit of favorable testimony from him, and then unreasonably hope that the jury would disregard his ultimate conclusion. Defense counsel instead sought to present multiple opinions that Awkal had a history of serious mental problems and that he was insane at the time of the crime. We therefore find the dissent's characterization of the expert witnesses presented by Awkal's counsel as being part of a bad joke or analogous to an episode of *The Three Stooges* to be totally unjustified.

The fact that defense counsel presented three expert witnesses to testify regarding the insanity issue distinguishes the instant case from *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), where this court held that Combs's defense counsel was ineffective under a pre-AEDPA standard of review, *id.* at 277 n.5. Combs's counsel called only one expert witness to testify regarding the sole defense theory—that Combs's intoxication deprived

him of the ability to form an intent to kill.  *Id*. at 287-88.  The expert contradicted that theory when he testified on cross-examination that Combs had acted purposefully and intentionally.  *Id.* at 287. We found that the expert's testimony "was completely devastating to the defense." *Id*. at 288.

The only similarity of this case to *Combs* is that one expert witness—here, Dr. Rizk—contributed testimony favorable to the defendant on direct examination, but ultimately contradicted the defense's insanity theory when cross-examined by the prosecution.  There the similarity ends.  In the present case, Awkal's counsel presented three witnesses, two of whom squarely bolstered the insanity theory even if the testimony of one of them—Dr. Hewitt—was ultimately stricken due to his lack of a psychologist's license in Ohio.

More importantly,  Awkal's counsel had reviewed Dr. Rizk's sanity report prior to the trial.  That report plainly stated Dr. Rizk's opinion that Awkal was sane at the time of the crime.  Defense counsel's election to call Dr. Rizk notwithstanding their review of the sanity report indicates that they had made a strategic decision to do so, however questionable in hindsight.  This makes their decision virtually unchallengeable.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.").

Defense counsel presumably believed that having Dr. Rizk discuss Awkal's initial lack of competency to stand trial, as well as various other mental and emotional issues, would plant a seed of doubt regarding Dr. Rizk's expected testimony that Awkal was in fact sane at the time of the killings.  Similarly, defense counsel may have been trying to build up the credibility of Drs. Hewitt and McGee by showing the jury that all three doctors agreed on certain issues, such as Awkal's history of serious mental and emotional problems, even though they disagreed as to his sanity on the precise date in question.

Another reasonable explanation is that, knowing that the prosecution was going to call Dr. Rizk anyway, Awkal's counsel opted to call him as a witness to take some of the "sting" out of his adverse opinion by being able to present his favorable testimony first and by incorporating the negative testimony into Awkal's case-in-chief. *See F. Lee Bailey & Henry B. Rothblatt, Successful Techniques for Criminal Trials* 249 (2d ed. 1985) (explaining that the presentation of damaging evidence as part of a party's case-in-chief takes "the sting out of such evidence"); *id.* at 248-49 ("It is always desirable in planning one's trial strategy to anticipate disclosures by the prosecution of highly unfavorable and damaging evidence against the accused. . . . No matter how damaging the evidence against the accused is, expose it. *You can be sure that the prosecutor will!*") (emphasis in original); *see also Smith v. Spisak*, 130 S. Ct. 676, 691 (2010) (Stevens, J., concurring) ("[The State] defends [defense] counsel's closing argument as a reasonable strategic decision to draw the sting out of the prosecution's argument and gain credibility with the jury by conceding the weaknesses of his own case. I agree that such a strategy is generally a reasonable one . . . .").

Moreover, immediately after Dr. Rizk testified, Awkal himself took to the stand to testify about the medications he was taking, his original intent to kill himself at the courthouse, and the moment when he perceived that his brother-in-law changed into a monster and the walls collapsed around him. Awkal's testimony was thus consistent with the favorable portion of Dr. Rizk's testimony and directly rebutted the negative portion, thereby giving credibility to Awkal to the extent that their testimony was consistent and perhaps minimizing Dr. Rizk's negative testimony.

This potential strategy—to obtain favorable information from Dr. Rizk and attempt to minimize his unfavorable but inevitable testimony—would have been bolstered by the fact that defense counsel attempted to present Dr. Rizk's testimony in between completely favorable expert witnesses. In ordering their presentation of experts, defense counsel started with the favorable testimony of Dr. Hewitt and ended with the favorable testimony of Dr. McGee. This would have been a sound strategy because jurors are thought to remember best what they hear first and last. *See Thomas*

*A. Mauet, Trial Techniques* 114 (7th ed. 2007) (explaining that because jurors remember best what they hear first and last, trial counsel should present unfavorable testimony in between favorable testimony).

Moreover, if defense counsel had not called Dr. Rizk, the prosecution would have done so during its rebuttal. The prosecution instead presented only the testimony of Dr. Edward Dutton in rebuttal, who testified, based on a relatively brief evaluation, that Awkal was sane at the time of the crime. If Dr. Rizk had been presented in rebuttal as well, the last testimony that the jury would have heard would have been two doctors emphasizing the same point. By calling Dr. Rizk as part of their case-in-chief, defense counsel minimized this emphasis. Their decision to displace one of the prosecution's rebuttal witnesses seems strategic, particularly where Dr. Rizk gave some testimony that inferentially supported Awkal's insanity defense. Although the dissent asserts that Dr. Rizk's testimony on Awkal's previous incompetence to stand trial was irrelevant to whether Awkal was insane at the time of the crime, this evidence could have helped the jury conclude that Awkal had an established history of mental illness and was not malingering.

Alternatively, knowing that Dr. Rizk's testimony would eventually be presented to the jury, defense counsel might have wanted to expose this negative testimony as part of Awkal's case in order to bolster their credibility in the eyes of the jury. *See Paul Bergman, Trial Advocacy* 236 (4th ed. 2006) (reasoning that bringing out weaknesses during counsel's presentation may cause the jury to view the counsel as credible and fair and impress upon them that counsel has "nothing to hide").

Whatever defense counsel's reasoning, given their knowledge of Dr. Rizk's opinion on the insanity issue, their decision to call him as a defense witness rather than waiting for him to appear as a witness for the prosecution suggests that the decision was a strategic one. Defense counsel's prior knowledge of Dr. Rizk's opinion again distinguishes this case from *Combs*. There, defense counsel admitted that he was "surprised" when the expert testified that Combs was able to form an intent to kill. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000). This court recognized on appeal

that, "[a]lthough Combs's counsel's decision to present [the expert's] testimony may be considered a strategic one, it was a decision made without undertaking a full investigation" and was therefore unreasonable. *Id.* Such was not the case here.

In this way, the instant case is more analogous to *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007), than to *Combs*. Morales's sole defense was that he was not guilty by reason of insanity because he was unable to form the intent to commit murder due to his intoxication. *Id.* at 921. His defense counsel called a forensic psychologist who gave some testimony that was favorable to Morales, but ultimately testified on cross-examination that she did not believe that Morales had a viable voluntary-intoxication defense because voluntary intoxication alone is not a basis for the insanity defense. *Id.* at 936, 938. No other defense witness provided an alternative basis to justify Morales's conduct. Despite that, this court found that trial counsel's decision to call the expert did not constitute ineffective assistance of counsel, particularly because, "unlike Combs's counsel, Morales's trial attorney fully ascertained his expert witness's opinion before trial." *Id.* at 938.

The dissent assumes that because one of Awkal's attorneys responded to an inquiry by the trial court by saying "I don't have a response at this time" when asked why he was calling Dr. Rizk, there was no reason for his decision. During this exchange with the judge, however, defense counsel went on to explain that he was not answering because he was not "under a duty to respond to the prosecutor in a question and answer way. I know of no duty that I have to respond . . . ." Moreover, regarding whether the choice to call Dr. Rizk was a strategic one, defense counsel stated "I think the record will clearly reflect that we have not only had [Dr. Rizk's] report, but he's testified in this Court and as a result of his testifying he not only testified about his two reports, but he also testified about other subject matters relating to his evaluations." Counsel had therefore considered Dr. Rizk's involvement in Awkal's case and contemplated that Dr. Rizk would give testimony on subjects other than his ultimate sanity conclusion—including Awkal's prior incompetence to stand trial and difficult family life.

When considered "in light of all the circumstances," the Supreme Court of Ohio's assessment that defense counsel's decision to call Dr. Rizk was not "outside the wide range of professionally competent assistance," *see Strickland*, 466 U.S. at 690, is neither contrary to nor an unreasonable application of clearly established federal law. *See Williams v. Taylor*, 529 U.S. 362, 411 (2000). Our conclusion is supported by the Supreme Court's caution that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). Awkal has not overcome this strong presumption and therefore cannot satisfy *Strickland*'s deficiency standard.

## B.     Alleged prejudice

Even assuming for the sake of argument that Awkal had shown that the Supreme Court of Ohio's assessment of his counsel's effectiveness was unreasonable, he still cannot show that the Court's conclusion that he had not satisfied the prejudice prong of the *Strickland* ineffective-assistance test was also unreasonable. *See Strickland*, 466 U.S. at 691; *State v. Awkal*, 667 N.E.2d 960, 971 (Ohio 1996). There is no dispute that Awkal shot and killed his estranged wife and brother-in-law. The trial instead focused on whether he was legally insane at the time of the crime, and the evidence overwhelmingly indicates that he was not.

Awkal was furious at Latife and her brothers after she initiated the divorce. A few weeks after the divorce proceedings started, Awkal bought a semi-automatic pistol. He called Latife and her brother Omar on both the night of the purchase and the next morning to declare that he would murder Latife's entire family if she did not come back to him. A month or so later, he checked out their baby's medical files from the pediatrician's office. He also changed his address to his brother's house and wrote his brother a check for virtually all of the money in a court-frozen joint account that he maintained with Latife.

Awkal arrived at the courthouse on the morning of the killings with his pistol, 25 rounds of ammunition, copies of the baby's health records, and numerous childcare supplies on his person. Once inside, he apparently remained calm and said little before firing at least five bullets into Latife and Mahmoud at close range. Awkal then picked up the baby and proceeded to quickly make his way towards an exit. He vowed that no one was going to take the baby away, and he did not surrender until one of the deputies shot him in the back.

In short, nothing about the killings or the time leading up to them suggests that Awkal was in the grips of psychosis. To the contrary, the record shows that he had engaged in detailed planning for the killings and their aftermath. Awkal's calculated actions were in fact totally inconsistent with his testimony that he had intended to kill himself in front of Latife. We are therefore dubious that anyone representing Awkal could have established that, at the time of the killings, Awkal "did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts." *See* Ohio Rev. Code Ann. § 2901.01(A)(14) (setting the standard for a finding of not guilty by reason of insanity). In light of the overwhelming evidence against him, Awkal had little basis for a realistic hope of a successful insanity defense. *See Smith v. Spisak*, 130 S. Ct. 676, 687 (2010) (holding that defense counsel's alleged deficiency during closing argument did not raise a reasonable probability that the result would have been different given the graphic evidence of the crime presented by the prosecution and the "boastful" confessions by the defendant).

Moreover, the prosecution would have called Dr. Rizk to testify that Awkal was sane at the time of the offense if the defense had not done so first. The inevitability of Dr. Rizk's testimony in this case thus compels the conclusion that the trial's outcome would have been the same regardless of which side presented him as its witness. *See Strickland*, 466 U.S. at 694 (holding that prejudice is established by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

In response, the dissent makes the completely unsupported argument that Awkal's counsel conducted the examination of Dr. Rizk in a manner that would cause the jury to assume that Awkal accepted the doctor's "sanity" conclusion. This is contradicted not only by the fact that defense counsel presented two other experts—one who testified that Awkal was *not* sane at the time of the killings and one who testified regarding Awkal's difficult family life—but by counsel's redirect examination of Dr. Rizk where he had Dr. Rizk admit that all doctors make mistakes and by counsel's closing argument.

Furthermore, despite the dissent's assertions, Awkal did not solely rely on the defense that he was not guilty by reason of insanity. Once the jurors discredited Awkal's insanity defense, they had to choose among three homicide classifications—aggravated murder, murder, or voluntary manslaughter. Defense counsel emphasized that Awkal's only intent was to kill himself, and that Mahmoud's telling him that he was not the child's father caused him to go into a sudden fit of rage or passion. Awkal would have been guilty of the lesser-included offense of murder (as opposed to aggravated murder) if the jury had found a lack of prior calculation and design. Dr. Rizk's testimony that Awkal had been very depressed, that he had previously been found incompetent to stand trial, and that Awkal had been hospitalized for a psychotic episode in 1985 all supported Awkal's own testimony that he had planned to kill himself at the courthouse, which would suggest that Awkal shot his wife and brother-in-law without any prior calculation.

Similarly, Awkal would have been guilty of the lesser-included offense of voluntary manslaughter if he had killed while under the influence of a sudden passion or in a sudden fit of rage brought on by serious provocation. Dr. Rizk testified that Awkal had "major difficulties" with his family and that he was suffering from a delusion when he saw a monster's face immediately prior to the shooting. This testimony supported a finding that Awkal was acting under the influence of a sudden passion or rage. Counsel's decision to call Dr. Rizk therefore cannot be considered prejudicial where the majority of the doctor's testimony supported Awkal's alternative defense of lesser-included crimes.

In sum, the Supreme Court of Ohio's conclusion that Awkal failed to satisfy either of *Strickland*'s requirements for establishing the ineffective assistance of counsel at the guilt phase of the trial was not unreasonable.

## IV.  INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE

Awkal next contends that his trial counsel rendered ineffective assistance by failing to provide the trial court with a copy of a police report documenting Awkal's involuntary hospitalization in 1985 and by failing to present the testimony of competent mental health experts in support of his insanity defense at the penalty phase of the trial. The first part of Awkal's argument is procedurally defaulted, and the second part lacks merit.

### A.        Failure to provide mitigation evidence

At the conclusion of Dr. McGee's guilt-phase testimony, Awkal's counsel attempted to admit into evidence a medical report regarding Awkal's hospitalization in 1985 following an incident at work in which he apparently had a mental breakdown and collapsed.  The trial court sustained the prosecution's objection, reasoning that the document was difficult to read and lacked probative value because Dr. McGee had already testified about the episode detailed in the report.  Awkal argues that his counsel's failure during the penalty phase of trial to obtain and introduce a copy of a *police* report relating to the 1985 incident constituted the ineffective assistance of counsel.

But Awkal did not raise this allegation in state court.  "Before a federal court may grant habeas relief . . . , the prisoner must exhaust his remedies in state court.  In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also* 28 U.S.C. § 2254(b)(1)(A). "[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review." *Alley v. Bell,* 307 F.3d 380, 385 (6th Cir. 2002).

Awkal did not include this claim in his state-court appeals and is now barred by the statute of limitations from presenting it on state post-conviction review. *See* Ohio Rev. Code Ann. § 2953.21(A)(2) (requiring postconviction petitions to be filed no later than 180 days after the date on which the trial transcript is filed in the Supreme Court of Ohio or 180 days after the expiration of the time for filing an appeal). The claim is thus procedurally defaulted. Because Awkal has made no meaningful attempt to establish cause and prejudice for his default, *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (noting that a petitioner can overcome procedural default by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law," or by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice"), the claim is not properly before us for review. *See Williams v. Anderson*, 460 F.3d 789, 808 (6th Cir. 2006) (declining to reach the merits of the petitioner's claim where he failed to argue cause and prejudice to excuse the default).

**B.     Retaining and using qualified mental-health experts**

Defense counsel presented the testimony of three mental-health experts—Drs. Hewitt, McGee, and Samy—during the penalty phase of trial. Awkal contends that the presentation of these experts' testimony during the penalty phase, along with that of Dr. Rizk during the guilt phase, constituted the ineffective assistance of counsel with regard to mitigation evidence.

Awkal reasons that Dr. Hewitt's testimony during the penalty phase was a "mockery" because Dr. Hewitt was "discredited" at the guilt phase when the trial judge struck his testimony. The force of Awkal's argument is diluted, however, by the fact that the judge *did* allow Dr. Hewitt to testify during the penalty phase of the case. Moreover, Dr. Hewitt gave lengthy testimony at the penalty phase about Awkal's background, family, troubled marriage, and religion. He testified that Awkal's emotional state "collapsed" on the day of the murders, that the murders were "spontaneous," and that Awkal was unable to appreciate the criminality of his conduct. Dr. Hewitt also testified that Awkal was not "competent to know right from wrong or what he was doing and that this was a spontaneous kind of thing provoked by the overall

situation at the time." This testimony supported defense counsel's argument that Awkal suffered from a "mental disease or defect"—a mitigating factor under Ohio law. *See* Ohio Rev. Code Ann. § 2929.04(B)(3). Defense counsel clearly did not fall below an objective standard of reasonableness by presenting Dr. Hewitt's testimony on this mitigating factor. *See Strickland*, 466 U.S. at 687-88.

Awkal next argues that trial counsel "demonstrat[ed] their complete lack of preparation for the mitigation phase" by calling Dr. Rizk to testify at the guilt phase. He reasons that the presentation of Dr. Rizk at the guilt stage "destroyed any meaningful mitigation presentation because Dr. Rizk previously testified that Awkal was sane." But the standard under Ohio law for a plea of not guilty by reason of insanity differs from the standard for the mental-disease-or-defect mitigating factor provided by Ohio Revised Code § 2929.04(B)(3). *State v. Van Hook*, 530 N.E.2d 883, 890 (Ohio 1988) ("We note that the mitigating factor . . . utilizes the term 'substantial capacity[,]' which is a term allowing a broader range of [mental] conditions than the term 'capacity' standing alone."). Awkal's argument accordingly fails because Dr. Rizk's guilt-phase testimony was not necessarily inconsistent with the testimony of the penalty-phase experts about Awkal's mental condition for mitigation purposes.

As for the testimony of Dr. Salah Samy, another psychiatrist, Awkal submits that trial counsel completely failed to prepare Dr. Samy for his testimony. In support of this assertion, Awkal cites Dr. Samy's testimony that he could not give a loss-of-control opinion without more detailed information about Awkal. Dr. Samy did, however, testify that Awkal was not malingering and that, at the time of the shootings, Awkal had "developed [an] acute psychotic reaction." Awkal's counsel did not act unreasonably by presenting this favorable testimony.

Finally, Awkal argues that Dr. McGee "was a pediatrician, not board certified[,] and had no experience in forensic psychiatry." He accordingly reasons that defense counsel acted ineffectively by presenting such an unqualified expert to testify regarding his mental condition. But Awkal's argument overlooks Dr. McGee's qualifications, which are discussed in more detail above. At the mitigation phase, Dr. McGee also

testified that she had taken a law-school class on forensic psychiatry and had worked for four months with a forensic psychiatrist in Cleveland.

Defense counsel did not act unreasonably by calling Dr. McGee. Her testimony demonstrates that she was qualified to act as an expert witness on Awkal's behalf. *See Joyce-Couch v. DeSilva*, 602 N.E.2d 286, 290 (Ohio Ct. App. 1991) ("Under Ohio law, any doctor licensed to practice medicine is competent to testify about medical issues."). This court has held that "[a] licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006). Awkal can make no such showing regarding Dr. McGee. Because Dr. McGee was qualified under Ohio law to give an expert opinion, and in fact gave competent testimony that Awkal was mentally ill, Awkal's counsel was not constitutionally ineffective for retaining her and presenting her testimony during the penalty phase of the trial.

We thus conclude that Awkal's counsel was not deficient in the presentation of mitigation-phase evidence. Based on the record before us, a similar conclusion reached by the Supreme Court of Ohio, *see State v. Awkal*, 667 N.E.2d 960, 972 (Ohio 1996), was not unreasonable.

## V.  PROSECUTORIAL MISCONDUCT

Awkal's final issue on appeal focuses on an instance of prosecutorial misconduct. During closing argument at the guilt phase of the trial, the prosecutor made the following isolated comment about Dr. McGee's testimony:

> She comes in here and says for a brief moment that this guy hallucinated on January 7th and as a result of that he was legally insane, but he is now sane, so let him walk out the door.

Awkal contends that this statement constituted prosecutorial misconduct and that, as a result, he was denied the due process of law.

The prosecutorial-misconduct claim is procedurally defaulted. Because Awkal's counsel made no contemporaneous objection to the prosecution's statement, the Supreme

Court of Ohio reviewed the claim under the plain-error standard. *Awkal*, 667 N.E.2d at 970. The Court denied the claim, explaining:

> It was error for the prosecutor to argue that Awkal would "walk out that door" if the jury found him not guilty by reason of insanity. First, this statement was an incorrect statement of the law. If Awkal were found not guilty by reason of insanity, he would have been confined to a psychiatric facility until his sanity was restored. This statement plainly sought to inflame the passions of the jury. However, the prosecutor's arguments, as a whole, although impassioned, did not deprive Awkal of a fair trial and did not constitute plain error.

*Id.* at 970-71.

Awkal subsequently raised the prosecutorial-misconduct allegation in his federal habeas petition. The district court correctly determined that the allegation was procedurally defaulted. Federal habeas review is generally precluded where a state court decides not to address a petitioner's federal claims because he has failed to meet a state procedural requirement "that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). And a state appellate court's plain-error review of a procedurally defaulted claim does not waive the procedural default. *Lundgren*, 440 F.3d at 765.

Here, the Supreme Court of Ohio invoked the state's contemporaneous-objection rule, explaining that "Awkal objected to neither of these alleged errors [the claim at issue along with an unrelated prosecutorial-misconduct claim] at trial. Therefore, he has, with the exception of plain error, waived the issues." *Awkal*, 667 N.E.2d at 970. This court has held that the contemporaneous-objection rule is an adequate and independent state ground barring federal habeas review, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005), and that plain-error review is not inconsistent with the procedural default. *Lundgren*, 440 F.3d at 765. Because Awkal again fails to advance a cause-and-prejudice argument to excuse his default, the issue is not properly before us for consideration.

## VI.   CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court in denying Awkal's petition for habeas relief.

---

## CONCURRENCE

---

HELENE N. WHITE, Circuit Judge, concurring. I concur in the majority opinion and write separately only to state that I do not agree that the facts leading up to the shooting so undermined Awkal's insanity defense that there was no realistic hope of the defense succeeding. Nevertheless, as the majority observes, Dr. Rizk's testimony was inevitable, and there is no reason to conclude that the timing of that testimony or defense counsels' manner or presentation affected the jury's verdict.

———————————

## DISSENT

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. Awkal's primary defense to the capital charge was that he was not guilty by reason of insanity. Any remotely competent attorney knows that an insanity defense relies mainly upon expert testimony regarding the defendant's mental state. But Awkal's counsel's presentation of expert psychological testimony at the guilt phase sounds like the opening of a bad joke: "Three defense experts walk into court. One got his degree from a mail-in university, is not licensed, and cannot testify. One is well-credentialed but testifies against the defendant. And the third is not certified in psychiatry." Or perhaps the better analogy is an episode of *The Three Stooges*.[1] But, however one wishes to describe it, it is clear what counsel's performance was not: the kind of representation constitutionally required in a capital case. I find the majority's opinion to the contrary unpersuasive, so I respectfully dissent.[2]

## A. Clearly Established Federal Law

To succeed on his ineffective assistance of counsel claim, Awkal must show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Awkal must then demonstrate prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

———————————

[1]When I say that counsel's handling of expert testimony on the sanity issue reminds me of *The Three Stooges*, I do not mean to cast aspersions at the intelligence of the three doctors. I have no reason to believe that they are anything other than diligent, intelligent individuals, though counsel clearly could have found two doctors with more impressive credentials for purposes of supporting this most important issue. Rather, *The Three Stooges* comes to mind from a director's point of view. The director of *The Three Stooges* created a product that came across to his audience as bungling. Based on my review of the record, Awkal's counsel engaged in a similar task.

[2]Awkal brings several habeas claims, alleging errors at both the guilt and the sentencing phases of his trial. The majority addresses and holds against Awkal on all of these claims. Although I do not necessarily agree with the majority's disposition as to each claim, I focus solely on the guilt-phase ineffective assistance of counsel claim. Because Awkal received constitutionally ineffective assistance of counsel at the guilt phase of his trial, he should receive a new trial. Therefore, I need not address his other claims.

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Moreover, as our review of this case is controlled by AEDPA, Awkal must "show that the [Ohio Supreme Court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).

**B.       Ineffective Assistance of Counsel**

**1.       Deficient Performance**

Awkal's sole affirmative defense to the murder charges was that he was not guilty by reason of insanity. During the guilt phase, Awkal's counsel presented three experts to testify in support of this defense: Dr. Paul Hewitt, Dr. Magdi S. Rizk, and Dr. Eileen S. McGee.

Dr. Hewitt testified first but, "while attempting to qualify Dr. Hewitt to give an opinion on that issue, counsel established that Dr. Hewitt was not competent to engage in forensic psychology." *State v. Awkal*, 667 N.E.2d 960, 971 (Ohio 1996). Most glaringly, Dr. Hewitt was not licensed.[3] Because the trial court determined that he was not qualified to enter an opinion on the sole guilt-phase issue—whether Awkal was sane at the time that he committed the attack—the court excluded Dr. Hewitt's testimony and instructed the jury to disregard what testimony he had already provided. Dr. Hewitt was thus never able to opine on Awkal's sanity.

Next, the defense called Dr. Rizk, a court-appointed forensic psychiatrist who had originally evaluated Awkal to determine whether he was competent to stand trial. Defense counsel had Dr. Rizk testify on direct examination regarding his conclusion about Awkal's competency to stand trial. (One may recall that the main issue during the guilt phase was Awkal's sanity at the time of the attack; the jury was not there to decide whether Awkal could be tried.) Then, on cross-examination by the State, Dr. Rizk

---

[3]Though it is unclear how important it was to the trial court's decision to strike Dr. Hewitt, it was also revealed that he had received his Master's Degree and Doctorate from Century University in California, a mail-in university.

opined that, even though Awkal was initially incompetent to stand trial, he was nevertheless sane at the time of the attack.

Finally, Dr. McGee testified that Awkal was not sane at the time of the murders. Dr. McGee was a licensed pediatrician who, though well-trained, "was not yet board certified in psychiatry, had no experience in forensic psychiatry, and had been practicing psychiatry for only one year." *Id.* at 972. The state court stated that Dr. McGee's "opinion may have been diminished by her lack of certification and inexperience." *Id.* Thus, her testimony was of very limited value when following Dr. Rizk's devastating sanity opinion.

Counsel's choice and then presentation of experts is baffling. Not only did he call two experts whose credibility was weak or whose testimony was inadmissible at the guilt phase, but counsel's one certified psychiatrist undermined Awkal's sole defense by testifying unequivocally on cross-examination that Awkal was sane at the time of the attack. Counsel's handling of Dr. Rizk, therefore, was not only troubling, but disastrous. Either counsel was completely unaware of how Dr. Rizk would testify regarding Awkal's sanity, which shows a glaring lack of basic trial skills as Dr. Rizk had already issued a written report finding Awkal to have been sane, or counsel knew that Dr. Rizk would opine that Awkal was sane at the time of the attack but did not seek to address it on direct examination, in which case the decision to call him as a witness is senseless.[4] What little value there is in having a psychiatrist testify that Awkal had previously been found incompetent to stand trial was obviously overshadowed by having that same psychiatrist opine that Awkal was sane at the time of the attack. The only plausible conclusion is that counsel's actions with regard to Dr. Rizk at the guilt phase, combined

---

[4]The majority suggests that the fact that Awkal's counsel possessed Dr. Rizk's report before calling him as a witness demonstrates that the decision to do so was strategic. (*Ante* at 13.) First, regardless of whether Awkal's counsel knew or should have known of Dr. Rizk's opinion, the decision to call an expert witness that contradicted Awkal's only affirmative defense amounts to deficient performance. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) ("Regardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable."). Secondly, counsel's performance was not deficient solely by virtue of having called Dr. Rizk to testify, but rather, having called Dr. Rizk to testify, counsel was deficient in failing to impeach or even address Dr. Rizk's devastating sanity opinion.

with counsel's reliance upon two other inherently unreliable "experts," constituted the deficient performance necessary to establish ineffective assistance of counsel.

The majority, of course, disagrees and puts forth various arguments in support of its conclusion that counsel's actions were the result of strategy instead of incompetence. So let us examine some of these arguments in more detail.

The majority asserts that this case is more similar to *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007), in which we rejected an ineffective assistance argument, than *Combs*, in which we found ineffective assistance. I strongly disagree. The facts of Awkal's case are materially indistinguishable from *Combs*. Like Awkal, Combs did not contend that he had not committed the attack. *Combs*, 205 F.3d at 273. Instead, Combs's defense was that "he was too intoxicated from alcohol and drugs to form the requisite intent to kill the [two] women or to have committed the killings with prior calculation and design." *Id.* Combs's counsel presented testimony that Combs was intoxicated, but he called only one expert witness on this point. That witness was a psychologist who, like Dr. Rizk, testified on cross-examination that, contrary to Combs's defense, Combs had killed intentionally. *Id.* We held that Combs received ineffective assistance of counsel because,

> [r]egardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable. . . . [N]ot only did [the expert's] testimony destroy any hope of a successful intoxication defense, but it also helped the prosecution to establish one of the elements of its case in chief. Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable.

*Id.* at 288. In sum, we found that calling an expert who, on cross-examination, directly contradicted the defendant's sole defense constituted ineffective assistance of counsel. Dr. Rizk's testimony followed exactly the same script.

The majority attempts to distinguish Awkal's case from *Combs* by pointing to the fact that Awkal's counsel presented three expert witnesses regarding the insanity

issue rather than only one.[5] This distinction may carry some weight if it were true that the other two experts offered by Awkal's counsel had added any value. But instead, one of the expert's testimony was stricken due to his lack of qualification, and the other expert was a relatively novice, uncertified psychiatrist, opining on the mental state of a man put on trial for his life. In essence, the majority reasons that this case is different from *Combs* because *Combs* involved only one terrible decision but this case involved three. This is a distinction to be sure, but it cuts in favor of Awkal, not the State. The majority's reasoning to the contrary leads to the apparent, but vexing, takeaway that, in the Sixth Circuit, numerous instances of incompetence may aggregate into competence, that defense counsel may insulate themselves from ineffective assistance claims simply by making multiple errors.

The majority's reliance on *Morales* is also misplaced. In *Morales*, a defendant charged with murder claimed that he was not guilty by reason of insanity. 507 F.3d at 921, 936. Morales alleged that his voluntary intoxication rendered him unable to "appreciate the consequences of his acts or refrain from committing those acts, or understand the difference between right and wrong" at the time of the crime. *Id.* at 921 (internal quotation marks omitted). In spite of the fact that intoxication played a role in Morales's defense, Morales's counsel called a forensic psychologist to the stand whom Morales's counsel knew "did not believe that Morales had a viable voluntary-intoxication defense." *Id.* at 936.

On direct examination, the psychologist provided favorable testimony, outlining Morales's psychological problems, which included a "personality disorder" that, when "combined with [Morales's] alcohol dependency and abuse, deprived him of the ability to refrain from or understand the wrongfulness of his actions." *Id.* at 938. On cross-examination the psychologist conceded that, legally, "voluntary intoxication alone [was] not a basis for the insanity defense." *Id.* The psychologist went on to testify that

---

[5]The majority also distinguishes *Combs* on the basis that it is pre-AEDPA. Though this distinction is maybe material for purposes of *Combs*'s habeas ruling, it does not affect *Combs*'s constitutional finding of deficient performance under *Strickland* on materially indistinguishable facts.

"voluntary intoxication was not the only contributing factor in the murder," citing Morales's other psychological problems.  *Id.*

Faced with Morales's claim that his counsel was ineffective for calling the psychologist, the *Morales* Court determined that the psychologist's statement regarding the legal standard for insanity was plainly "unhelpful," but concluded that the case was distinguishable from *Combs* for several reasons.  *Id.*  Most significantly for Awkal, the Court determined that, unlike *Combs*, the psychologist's testimony in *Morales* did not completely undermine Morales's only affirmative and complete defense.  Rather, Morales's insanity defense was based on a combination of his psychological problems and his intoxication, and the psychologist testified to that effect.  *Id.*  Thus, "the substance of [the expert's] testimony" in *Morales* "supported the defense theory."  *Id.*

Here, however, the facts are strikingly different.  Dr. Rizk's testimony that Awkal was sane at the time of the murders completely undermined Awkal's *only* affirmative and complete defense—that he was insane when he killed his wife and brother-in-law.  Therefore, Dr. Rizk's statement that Awkal was sane was not just "unhelpful", *cf. id.*, it was fatal.

After seeking, unconvincingly, to distinguish *Combs*, the majority next engages in that time-honored tradition of ineffective assistance of counsel cases—conjuring up possible explanations to make counsel's actions seem like anything other than buffoonery.  The majority is correct that the Supreme Court has indicated that reviewing courts should seek to contrive an explanation for counsel's actions, even if it is mere speculation.  But, at the very least, these imagined explanations should be plausible and not contradicted by the record.

The majority first suggests that perhaps defense counsel called Dr. Rizk so that he could testify as to Awkal's competence to stand trial and other mental issues in order to "plant a seed of doubt" regarding his conclusion that Awkal was sane.  (*Ante* at 13.) Relatedly, the majority suggests that perhaps counsel called Dr. Rizk in order to "take the sting out" of Dr. Rizk's damaging sanity opinion.  (*Id.* at 14.)  Perhaps counsel called Dr. Rizk to preempt what would surely have been a decision by the prosecution to call

Dr. Rizk in its rebuttal case. (*Id.* at 15.) Or perhaps counsel called Dr. Rizk in an effort to bolster credibility by acknowledging weaknesses. (*Id.*) All of these hypotheses rest on the theory that counsel called Dr. Rizk in order to address what counsel knew would be damaging testimony, either by preemptively discrediting the testimony or managing its "sting." These explanations could be sound trial strategies, *if* it were the case that defense counsel actually addressed the damaging testimony in his examination of the witness. But here, counsel never attempted to elicit from Dr. Rizk that he was of the opinion that Awkal was sane at the time of the crime; that gem came out on the prosecution's terms during cross-examination. Nor did counsel seek on redirect examination to discredit Dr. Rizk's sanity opinion with his testimony on direct examination regarding Awkal's mental issues and incompetence to stand trial.

In short, the record does not support the majority's post hoc justifications for counsel's actions and, in fact, directly contradicts them. It cannot plausibly be speculated that counsel was seeking to "plant a seed of doubt" about Dr. Rizk's sanity opinion unless there is some indication that counsel actually did anything in his examination of Dr. Rizk to discredit that opinion. Here, Awkal's counsel neither suggested doubt on direct examination nor discredited the sanity opinion on redirect, so counsel clearly was not questioning Dr. Rizk with an eye toward the damaging sanity opinion. Similarly, as to the "take the sting out" conjecture, this could not possibly have been counsel's strategy when counsel did not actually elicit the damaging testimony.[6] Far from taking the sting out by eliciting the damaging testimony on direct examination, counsel compounded the sting by allowing the prosecution to elicit the opinion on cross-examination after defense counsel had relied on the witness and bolstered his credibility with the jury.

This unfolding of events is devastating as a matter of trial dynamics. In essence, counsel examined Dr. Rizk on direct, without any preemptive impeachment, and then tendered the witness to the prosecution, leaving the jury with the impression that

---

[6]I am sure Mssrs. Bailey and Rothblatt, *see ante* at 14 (citing Bailey and Rothblatt, *Successful Techniques for Criminal Trials*), would not read this transcript and conclude that counsel was engaging in the "take the sting out" maneuver.

Awkal's own counsel endorsed Dr. Rizk's entire testimony. Thus, when the prosecution elicited on cross-examination that Dr. Rizk believed Awkal to have been sane at the time of the attack, the jury likely assumed either that defense counsel also endorsed this testimony or had hoped to suppress it. Counsel reinforced this conclusion when he ignored the sanity opinion on redirect examination. This is not sound trial strategy, and the majority's attempts to justify counsel's actions simply do not hold water.

The rest of the majority's speculation about possible reasons for counsel's actions is similarly unpersuasive. Perhaps counsel wanted Dr. Rizk's favorable testimony regarding Awkal's initial incompetence to stand trial. (*Ante* at 14.) But whether Awkal was at one point incompetent to stand trial (as he had obviously been subsequently found competent) was at most only marginally probative as to whether he was sane at the time of the attack. It cannot be sound trial strategy to seek weak and likely irrelevant favorable testimony when you know that doing so is sure to bring in highly damaging and relevant testimony. Under Ohio law effective at the time of Awkal's trial, "[a] person is 'not guilty by reason of insanity' . . . *only* if he proves . . . that at the time of the commission of the offense, he did not know, as a result of severe mental disease or defect, the wrongfulness of his acts." Ohio Rev. Code § 2901.01(N) (emphasis added). Thus, the only portion of Dr. Rizk's testimony relevant at the guilt phase was his opinion regarding Awkal's sanity at the time of the attack. Other testimony regarding Awkal's competence to stand trial or matters related to his family background had, at best, no impact on the guilt phase and seems unlikely to have constituted any kind of trial strategy.

On a related note, perhaps counsel sought to keep Dr. Rizk's favorable testimony but downplay the bad by bracketing his testimony with that of Dr. Hewitt and Dr. McGee. (*Ante* at 15.) However, this also is not plausible explanation based on the record. As stated above, counsel did not purposefully elicit any damaging testimony from Dr. Rizk, so he could not have been meaning to hide the damaging testimony between the favorable testimony of Drs. Hewitt and McGee. Moreover, Dr. Rizk's damaging sanity opinion was unquestionably a heavy piece of evidence, so it would take

some rather strong brackets to contain it.  Counsel could not have expected Dr. Hewitt to provide the necessary front-end support in the jury's mind, and, indeed, the court struck Dr. Hewitt's testimony in its entirety.  Counsel also could not have expected the testimony of Dr. McGee—a former pediatrician and uncertified psychiatrist with no experience in forensic psychiatry—to provide the back-end support needed to remedy Dr. Rizk's devastating testimony.

Also related, perhaps counsel called Dr. Rizk in Awkal's defense to remove one arrow from the prosecution's quiver so that the prosecutor would have only one expert instead of two on rebuttal.  (*Id.*)  Like many of the majority's other hypotheses, however, this speculation also incorrectly presumes  that counsel called Dr. Rizk for the purpose of eliciting his damaging sanity opinion.  As shown above, the record contradicts that line of reasoning.  If counsel had called Dr. Rizk with an eye towards addressing his sanity opinion, one would expect that he would have actually elicited it.

In sum, the majority valiantly but vainly attempts to invent an explanation for counsel's actions that could be characterized as strategic, as none of the proffered explanations are plausible when one looks at what defense counsel actually did.  The majority attempts to respond to my reasoning, but at no point does it offer an explanation for what I see as the most damning fact for its position:  counsel never addressed Dr. Rizk's sanity opinion.  At some point, Ockham's Razor must apply—the simplest answer is usually the correct one.  Here, in light of the majority's numerous failed attempts to justify counsel's actions, the simplest answer is that counsel did not have the foggiest idea what he was doing when he decided to put Drs. Hewitt, Rizk, and McGee on the stand.  There was no grand plan.

Instead, it appears that counsel was merely throwing whatever evidence he could find at the jury and hoping something would stick.  Confirming this conclusion is the fact that, when the trial judge asked whether counsel had a strategic reason for calling Dr. Rizk, counsel responded, "I don't have a response at this time," (J.A. 2064), and went on to posture that he had no duty to explain himself but of he course he had a reason.  This, to me, is code for "no."  Counsel's actions clearly were not the sound trial

strategy that *Strickland* seeks to protect.**7** I therefore would find that counsel rendered constitutionally ineffective assistance.

### 2.    Prejudice

In addition to showing that his counsel's performance was deficient, Awkal has shown that the deficiency prejudiced him. The State presented other evidence that Awkal was legally sane at the time of the murders and that Awkal acted with prior calculation by pointing to, among other things, the fact that Awkal had diapers and baby supplies in his car at the time of the murders, that he was arrested with a full clip of bullets, and that he had taken steps to move to another area. (J.A. at 2444-50.) Awkal countered this evidence by explaining that he had intended to commit suicide, but his mental instability caused him to break with reality and kill his wife and brother without intent or knowledge of his actions. But, as in *Combs*, counsel's decision to call Dr. Rizk as an expert "destroy[ed] any hope of a successful [insanity] defense" and "was completely devastating to the defense." *Combs*, 205 F.3d at 288; *see also id.* at 290 ("The testimony of the sole defense expert that Combs, though intoxicated, nevertheless acted with purpose and intent was obviously damaging to the defense. Furthermore, [the expert's] testimony provided the State with its most powerful evidence of purpose.").

The majority claims that no prejudice resulted from Dr. Rizk's testimony and even offers that, since the prosecution would have called Dr. Rizk anyway, the trial's outcome would have been the same regardless of who presented him as a witness. However, that the jury would have heard Dr. Rizk's testimony at some point does not address the reality that Awkal was prejudiced by his counsel's presentation and handling of the expert testimony on mental state. The damage was not that testimony countering Awkal's sole defense was presented at some point in the trial, because, as the majority notes, "it is always desirable in planning one's trial strategy to anticipate disclosures by the prosecution of highly unfavorable and damaging evidence against the accused . . .

---

**7**If counsel's unexplainable actions, when viewed in light of the entire record, do indeed qualify as the strategy that *Strickland* says is constitutionally sufficient to satisfy the Sixth Amendment's guaranty of competent counsel, strategy has become "stragedy" and *Strickland* itself needs to be revisited. The Constitution demands better, and we should demand better.

you can be sure the prosecutor will!" (*Ante* at 14 (citing Bailey & Rothblatt).) The harm was in the fact that Awkal's *own* counsel called three expert witnesses, the most credible of which completely destroyed Awkal's defense, while the other two were not at all persusive. And, as stated above, counsel conducted the examination of Dr. Rizk in a manner that would lead the jury to conclude that Awkal's team found Dr. Rizk's testimony reasonable. Thus, when Dr. Rizk testified on cross-examination that Awkal was sane at the time of the attack, a reasonable jury would have assumed that Awkal accepted this conclusion.[8] While it is a normal part of the trial for the prosecution to attack a defendant's defense, it is highly unusual for defendant's own counsel to undermine his only defense through his presentation of experts.

Furthermore, reactions from the judge and prosecutor when defense counsel called Dr. Rizk only buoy the conclusion that counsel's decision was highly unusual and harmful. Before Dr. Rizk took the stand, the judge, at the prompting of the prosecutor, asked Awkal's counsel if he had "strategic reasons for calling Dr. Rizk." (J.A. at 2064-66.) Defense counsel replied that he had no response at that time, presumably because there was no strategy. The prosecutor openly wondered why counsel made this choice and, in closing arguments highlighted the damaging decision, telling the jury, "Then [defense counsel] called one of our witnesses, Dr. Rizk, to the stand. I am still trying to figure that one out." (J.A. at 2457.) Once Awkal's own expert testified that Awkal was sane at the time of the murders, the jury could not conceivably conclude—with the sole backing of an uncertified psychiatrist—that Awkal was actually insane at the time of the crime. Thus, it is reasonable to assume that defense counsel's decision to call Dr. Rizk sealed Awkal's fate.

---

[8]The majority claims that this is merely unsupported speculation. I would first note that the very nature of ineffective assistance cases is engaging in post hoc speculation. The majority's opinion is rife with it. Furthermore, I do not believe that my conclusion is unsupported. Having eliminated, based on the flow of counsel's direct and redirect examination, the prospect that counsel called Dr. Rizk for the purposes of debunking his sanity opinion, the only conclusion remaining is that counsel called Dr. Rizk to endorse his testimony. One cannot endorse some of a witness's testimony but reject other aspects of that testimony unless one actually engages in the exercise of rejecting the unfavorable aspects of the testimony. Here, counsel never took issue with Dr. Rizk's sanity opinion.

Furthermore, Awkal has shown prejudice even though, or perhaps because, his counsel called an uncertified psychiatrist who testified that Awkal was legally insane at the time of the murders. During the course of a normal trial, prosecution and defense experts often disagree and it is up to the jury to suss out the conflict. But counsel's actions rendered this trial distinctly abnormal when, without any apparent explanation or purpose, he offered an expert who agreed with the prosecution's expert on the most critical fact question in the entire case. Calling a second "expert" of marginal persuasiveness could not possibly undo the damage caused by counsel's handling of Dr. Rizk.

### C.      Ohio Supreme Court's Application of *Strickland* to These Facts

In addition to showing that his counsel's performance was deficient and that he was prejudiced by this deficiency, Awkal has "show[n] that the [Ohio Supreme Court] unreasonably applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cone,* 535 U.S. at 699. After considering Awkal's ineffective assistance of counsel claims, the Ohio Supreme Court concluded that "Awkal was not deprived of a fair trial by his trial counsel. Given the evidence supporting his conviction, he was not prejudiced by what occurred at trial." *Awkal*, 667 N.E.2d at 971. The Ohio Supreme Court explained its holding:

> Counsel also called Dr. Rizk to testify during the guilt phase. Dr. Rizk is adequately qualified and has testified in numerous other similar circumstances. However, Dr. Rizk testified that Awkal was sane at the time of the murders. This testimony obviously damaged Awkal's affirmative defense that he was not sane when he committed the murders. Yet, portions of Dr. Rizk's testimony assisted the defense, including testimony about religion as a basis for Awkal's marital problems, his medication levels, and his hallucinations.
>
> Counsel concluded Awkal's affirmative defense by calling Dr. McGee, a psychiatrist. Dr. McGee was not yet board certified in psychiatry, had no experience in forensic psychiatry, and had been practicing psychiatry for only one year. Dr. McGee testified that Awkal, as evidenced by his hallucinations involving his wife in his cell in Dayton, had broken with reality at the time of the murders. This break with reality impaired his ability to know right from wrong at the time of the murders. Although her opinion may have been diminished by her

lack of certification and inexperience, Dr. McGee supported Awkal's affirmative defense.

Thus, of the three doctors called to testify for the defense, the testimony of one was stricken from the record, one gave an opinion contradicting Awkal's affirmative defense but also gave other evidence that assisted that defense, and one testified that Awkal was not mentally responsible for his acts. However, Drs. McGee and Hewitt were called to testify and did testify during the penalty phase of the trial, giving pro-defense opinions. Dr. Samy also gave a pro-defense opinion in the penalty phase.

Awkal's counsel obviously had some plan in mind. Dr. Hewitt conceivably could have been allowed to testify as an expert witness, and Dr. Rizk did make an earlier finding that Awkal was incompetent to stand trial. In hindsight it appears that Awkal may have been better served to call only Dr. McGee during the guilt phase, and call her and the other defense doctors during the penalty phase, if the trial would reach that stage. However, the end result of tactical trial decisions need not be positive in order for counsel to be considered "effective." We do not believe the record establishes that Awkal's attorneys were ineffective at trial.

*Awkal*, 667 N.E.2d at 971-72 (citation omitted).

This analysis constitutes an unreasonable application of *Strickland*. The state trial court obviously recognized the extent of the harm caused by defense counsel's decision to call Dr. Rizk—it concedes that calling Dr. Rizk was not a good idea in hindsight. But the court nevertheless disregards the prejudice by boldly proclaiming that "Awkal's counsel obviously had some plan in mind." This strikes me more as wishful thinking rather than legal analysis based on the evidence in the record. The court assumes that counsel had a plan because, otherwise, it would have to answer tough questions and face uncomfortable realities about the state of indigent, and especially capital, representation. Though *Strickland* is, for better or for worse, extremely solicitous of lawyers, it is not a license to rely on baseless assumptions to escape hard questions.

The court also mischaracterized Dr. Rizk's testimony as somehow helpful to Awkal. This too overlooks reality. Though Dr. Rizk testified about Awkal's family and psychiatric history, that testimony was neither here nor there at the guilt phase where the

only relevant issue was Awkal's sanity at the time of the attacks. Ohio Rev. Code § 2901.01(N). Thus, Dr. Rizk's other statements at the guilt phase were, at best, neutral and could not be said to "assist" Awkal's defense. Dr. Rizk's relevant testimony destroyed Awkal's only affirmative defense, a fact that the Ohio Supreme Court ignored when it characterized Dr. Rizk's testimony as part of a larger strategy. Thus, the court unreasonably applied *Strickland* to Awkal's case.

Because the Ohio Supreme Court's application of *Strickland* was objectively unreasonable, and because Awkal received ineffective assistance of counsel at the guilt phase of the trial, I would grant habeas relief and order a new trial within ninety days.

I respectfully dissent.