RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

THOMAS BARTON,

*Petitioner-Appellant,*

v.

No. 12-4003

WARDEN, SOUTHERN OHIO CORRECTIONAL FACILITY,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:09-cv-00353—S. Arthur Spiegel, District Judge.

Argued: March 12, 2014

Decided and Filed: May 15, 2015

Before: MOORE, WHITE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christopher J. Pagan, REPPER, PAGAN, COOK, Middletown, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Christopher J. Pagan, REPPER, PAGAN, COOK, Middletown, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

PER CURIAM. Thomas Barton appeals the denial of his petition for a writ of habeas corpus by the United States District Court for the Southern District of Ohio. He contends that

the State's withholding of evidence that would have impeached the sole witness against him entitles him to relief under *Brady v. Maryland*, 373 U.S. 83 (1963), and he asserts that the district court erroneously accorded deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, to the state trial court's decision to the contrary. We agree. For the reasons set forth below, we **REVERSE** the judgment of the district court and **CONDITIONALLY GRANT** Barton's federal habeas petition, unless the State retries Barton within six months.

## I. BACKGROUND

### A. Factual and Procedural History

This case comes to us following a lengthy procedural history, recounted in detail in the report and recommendation of the federal magistrate judge to whom Barton's petition was initially referred. R. 44 (Magistrate Judge's Report and Rec. at 1–46) (Page ID #2395–2440). The district court affirmed and adopted this report and recommendation, along with the recommendations in a supplemental report issued by the magistrate judge in response to Barton's objections. *See* R. 49 (Magistrate Judge's Supplemental Report and Rec. at 1–12) (Page ID #2488–99); R. 52 (Dist. Ct. Op. and Order at 1) (Page ID #2518).

Only one of the claims that Barton raised before the district court, and in the state courts before that, is at issue on appeal. *See id.* at 9–10 (Page ID #2526–27); Pet'r Br. at 1, 10. Accordingly, we reproduce here the district court's brief summary of the prior state-court proceedings, and elucidate additional facts where necessary:

> This case . . . all began in 1995 with the killing of Petitioner's wife, Vickie [sic] Barton ("Vicki") during a burglary at her home. . . . Essentially the case of Vickie's [sic] murder went cold as detectives cleared Petitioner as a suspect after it was learned that he was at another location at the time of her death. In 1998, however, a career criminal named Gary Henson was arrested in an unrelated burglary, and Henson told the detective that his half-brother William Phelps had been involved romantically with Vickie [sic] Barton, and went to her house the day she was killed to steal things from her residence. According to Detective Hensley, who interviewed Henson, Henson said Phelps panicked when he found Vickie [sic] was at the house, and he shot her. Henson further stated he believed that Phelps' subsequent suicide, four months after the incident, was the result of his having killed Vickie. [sic]

Armed with such information, the Warren County Sheriff's Office exhumed Phelps' body to compare his DNA with DNA found at the crime scene. There was no match and the crime remained unsolved.

In April 2003, a "cold case squad" re-examined the case and discovered that in Petitioner's 911 call the day of the killing, he referenced needing to call "Phelp man."[1]  As such, the detectives linked Petitioner to Gary Henson, whose name was in Phelps' file.

Detectives interviewed Henson again in August 2003, at which time he provided information implicating Petitioner in his wife's killing.  Henson later testified at Petitioner's trial, stating Petitioner paid Phelps $3,000 to go to his and his wife's residence to scare her.[2]  Henson said that initially Petitioner had sought Henson's help with such endeavor, but that as Henson was in jail at the time, he could not help stage the burglary.

Henson further testified that when Phelps and an unidentified accomplice went to the house to scare Vicki, she surprised them, his accomplice "panicked," and then shot and killed her.  Phelps also told Henson that the accomplice sexually assaulted Vicki.

Under cross examination, Henson denied originally telling detectives that Phelps had shot and killed Vicki, and testified that the "he" to whom he was referring who shot Vicki was rather the unidentified accomplice.  The defense called Detective Hensley, who had interviewed Henson in 1998, who testified that in Hensen's [sic] interview at such time, Henson referred to Phelps as the shooter instead of the accomplice.

---

[1]There has been considerable debate over the contents of this call.  At trial, Barton presented two experts who testified that he said, "I gotta call for help, man." R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision Den. Def's Direct Appeal at 5) (Page ID #506).  The State rebutted this testimony with an expert of its own, who concluded that Barton said, "I gotta call Phelp, man." *Id.*  These dueling interpretations are consonant with each side's theory of the case.  If Barton actually asked Henson and Phelps to stage a burglary at his house, he might well have wanted to contact them to understand how and why the burglary had gone awry.  On the other hand, if Barton had no part in his wife's murder, he might—in the shock of the moment—have declared that he needed to call for help, even though he was already on the line with a 911 operator.  There is, as we elaborate below, at least a reasonable probability that the jury would have been inclined to consider Barton's version as the more credible one, had it heard the *Brady* evidence in question.  *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

[2]According to the State, "[t]he purpose of the staged burglary was to scare Vickie [sic] into moving away from the couple's horse farm, which Vickie was known to have been passionate about, and into the city limits of Springboro where, presumably, Vickie would feel safer, following the 'burglary.'  The reason appellant wanted to move into the city limits of Springboro was that appellant wanted to become that city's police chief.  Springboro has an unwritten rule that requires its police chief to reside in the city.  Thus, appellee theorized that appellant wanted Vickie and himself to move into Springboro in order to improve his chances of becoming that city's police chief." R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision Den. Def's Direct Appeal at 4) (Page ID #505).  This rule was apparently both unwritten and unenforced.  *See* Pet'r Br. at 2 ("[T]he very next chief hired by the City did not live in Springboro.").

The jury found Petitioner guilty as charged after trial in February 2005. The trial court ultimately merged Counts II and III of the Indictment and sentenced Petitioner to not less than five nor more than twenty-five years on Count I of the Indictment (for involuntary manslaughter), and to not less than ten nor more than twenty-five years on Count II of the Indictment (aggravated burglary), both sentences to be served concurrently.[3]

Petitioner subsequently appealed his sentence, which was denied on the appellate level, and which the Ohio Supreme Court dismissed as not involving any substantial question. Petitioner also filed a petition for post-conviction relief pursuant to O.R.C. § 2953.21, which was denied on the trial court level. The appellate court affirmed the denial, and the Ohio Supreme Court ultimately dismissed the appeal as again, not involving any substantial question.

R. 52 (Dist. Ct. Op. and Order at 1–3) (Page ID #2518–21).

Relying on 28 U.S.C. § 2254, Barton then filed a habeas petition in federal court, raising four grounds for relief. R.1 (Habeas Petition at 2–3) (Page ID #2–3). Barton later withdrew one ground, *see* R. 19 (Mem. in Opp'n to the State's Mot. to Dismiss and Barton's Cross-Mot. for Summ. J. at 1 n.1), and the magistrate judge rejected the remaining three, finding them to be procedurally defaulted, without merit, or both. R. 44 (Magistrate Judge's Report and Rec. at 25, 32, 45) (Page ID #2419, 2426, 2439). In his initial report, the magistrate judge also concluded that a certificate of appealability ("COA") was unwarranted. *Id.* at 46 (Page ID #2440).

Upon reviewing Barton's objections to his report and recommendation, however, the magistrate judge issued a supplemental report in which he recommended granting a COA as to Barton's *Brady* claim.[4] R. 49 (Magistrate Judge's Supplemental Report and Rec. at 10) (Page ID #2497). The district court agreed. R. 52 (Dist. Ct. Op. and Order at 9) (Page ID #2526).

---

[3]This appears to have been a typo, as both the magistrate judge's report and recommendation, *see* R. 49 (Magistrate Judge's Report and Rec. at 6) (Page ID #2400), and the state trial court's entry of judgment against Barton, *see* R. 11-1 (Entry of Judgment at 1) (Page ID #334), state that Barton must serve his sentences consecutively.

[4]In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a State violates a defendant's right to due process when it withholds evidence favorable to the defendant and material to his guilt or punishment despite a request for such evidence. The *Brady* rule extends to impeachment and exculpatory evidence alike. *See United States v. Bagley*, 473 U.S. 667, 676 (1985).

**B. Barton's *Brady* Claim**

At Barton's trial, the sole witness against him—Gary Henson—"testified that he had previously committed staged burglaries for hire. The state maintained that the burglary of [Barton's] residence appeared to have been staged as well." R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision to Den. Def.'s Pet. For Post-Conviction Relief 6) (Page ID #741). Prior to trial, "the state provided [Barton's] counsel with a police report documenting a burglary committed at the Lebanon residence of James and Ann Kelly in 1993. The Kelly burglary was suspected to have been staged due to the fact that items of personal property were placed on the floor and the house was not ransacked." *Id.*

At no point during Barton's prosecution did the State inform him that it had re-opened its investigation into the Kelly case after Henson implicated Barton in Vicki's homicide. When officers questioned Jim Kelly in 2004, shortly before Barton's trial, Kelly vehemently denied hiring Henson to stage a burglary in order to scare his family into moving to the city. *See, e.g.*, R. 11-2 (Ann Kelly Affidavit at 1) (Page ID #578). He reiterated these denials in the face of police threats to charge him with obstruction of justice should he decide not to testify against Barton. Id. at 2 (Page ID #579). Eventually, officials decided to drop the matter, filing the original police report as Brady material and handing it over to Barton's counsel. Still, "[n]othing in th[is] police report provided to [Barton] connected Henson to the Kelly burglary"—the police simply turned over the report without further explanation. R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision to Den. Def.'s Pet. For Post-Conviction Relief 6) (Page ID #741). Barton did not learn of the State's conversations with Kelly until after his trial, by dint of his own investigation.

**C. State Court Post-Conviction Proceedings and Federal Habeas Proceedings**

Barton first raised his *Brady* claim while seeking post-conviction relief in the Ohio Court of Common Pleas. *See, e.g.*, R. 44 (Magistrate Judge's Report and Rec. at 21) (Page ID #2415). He specifically challenged the State's failure to inform him (1) that Henson had told police that James Kelly had hired Henson to stage a burglary at the Kelly residence; (2) that the police had asked James Kelly whether he had hired Henson to stage such a burglary and threatened to charge Kelly with obstruction of justice if he did not testify against Barton; (3) that James Kelly

had denied hiring Henson to stage a burglary, even in the face of these threats; and (4) that Henson had attributed a nearly identical motive to Kelly regarding why he wanted a burglary staged at his rural home—to scare his family into moving to the city.

The Court of Common Pleas denied Barton's claim. Its reasoning follows in its entirety:

> Lastly, the third ground for relief is that the State failed to provide the defendant with *Brady* material. As the State points out a post-conviction relief petition is not a substitute for a direct appeal. By not raising any *Brady* issues on direct appeal, *the defendant is barred from raising this issue here. Strowmatt v. State*, (2002), 779 NE 2d 971 and *State v. Reynolds*, (1997), 79 Ohio St.3d 158. Henson admitted during his testimony that he had participated with his brother, William Phelp [sic], in committing other staged burglaries, which the crime here appeared to be. The Kelley [sic] burglary being a collateral matter *the Court has strong reservations* as to what limited relevant evidence would have been admitted had the defense attempted to raise the matter at trial. Again, the defense invites the Court to speculate that a different result might have occurred had this information been presented. Both burglaries are similar in the respect that Henson claimed he and his half-brother were hired to scare the owner's wife and daughter into moving from the home. Just because Mr. Kelley [sic] denies any part in such a plot, does not mean that the jury here would have believed him or that the jury would not have found a ring of truth in the similarity between the two stories. Again, trial counsel was faced with myriad of options as to how to proceed in impeaching Gary Henson's testimony. To the extent that some strategies were pursued while others were ignored or rejected, the Court has no way of knowing and will not speculate on.

R. 11-2 (Ohio Ct. of Common Pleas Decision and Entry Den. Def.'s Pet. For Post-Conviction Relief 3–4) (Page ID #614–15) (emphasis added).

The Ohio Court of Appeals affirmed the state trial court's judgment. Its reasoning, again in its entirety, follows:

> We note that appellant did not raise any *Brady* issues on direct appeal. "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or an appeal from that judgment." *State v. Perry* (1967), 10 Ohio St.2d 175, paragraph nine of the syllabus. Consequently, *appellant is barred from raising* any *Brady* issues in this postconviction relief proceeding.

R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision to Den. Def.'s Pet. For Post-Conviction Relief 6) (Page ID #741) (emphasis added).  Further appeal to the Ohio Supreme Court was denied.  R 11-2 (Ohio Supreme Ct. Decision to Den. Def's Leave to Appeal 1) (Page ID #790) ("[T]he Court denies leave to appeal and dismisses the appeal as not involving any substantial constitutional question.").

In reviewing Barton's subsequent federal habeas petition, the federal magistrate judge concluded, on the merits, that no *Brady* violation had occurred because Barton could have discovered Kelly's denial of Henson's allegation prior to trial.  R. 44 (Magistrate Judge's Report and Rec. at 25) (Page ID #2419).  The police report that Barton's counsel received from the State contained Becky Kelly's (James's daughter's) name and address.  *Id.* at 24 (Page ID #2418).  And, in a statement that is entirely unsupported by the record, the magistrate judge concluded that Barton was aware that police suspected the 1993 burglary of the Kelly residence to have been staged and that the crime had not yet been solved.  *Id.*; *see also* R. 11-2 (Kelly Police Report at 2–6) (Page ID #677–81) (copy of police report making no mention that crime had been staged or that crime remained unsolved).  Thus, according to the magistrate judge, Barton had the opportunity to interview the Kellys before his trial, and could have obtained the information in the statements that Ann and Becky Kelly gave to police during the 2004 re-investigation.  R. 44 (Magistrate Judge's Report and Rec. at 24) (Page ID #2418).  In his supplemental report, the magistrate judge also concluded that Barton failed to demonstrate that the state trial court's conclusions concerning the potential impact on the jury of the statements at issue were "contrary to or an unreasonable application of United States Supreme Court law."  *See* R. 49 (Magistrate Judge's Supplemental Report and Rec. at 6) (Page ID #2493); *see* 28 U.S.C. § 2254(d)(1); *Awkal v. Mitchell*, 613 F.3d 629, 638 (6th Cir. 2010).

The district court affirmed and adopted the magistrate judge's recommendations in full and denied Barton's habeas petition.  R. 52 (Dist. Ct. Op. and Order at 9) (Page ID #2526).  Barton timely appealed.

## II.  DISCUSSION

In order to resolve whether Barton's claim merits habeas relief, we must answer three separate but related questions.  First, we must determine whether Barton's *Brady* claim has been

"adjudicated on the merits" in state court. If so, we must follow § 2254(d)(1) and defer to the state court's conclusions, unless these conclusions fall within a limited set of statutory exceptions. If Barton's claim has not been adjudicated on the merits, but was subject instead to procedural default, we must determine whether Barton can show "cause" and "prejudice" to overcome this default. Finally, if Barton can show "cause" and "prejudice," we must determine whether Barton's claim is meritorious when reviewed de novo.

## A. AEDPA Deference

### 1. Scope and Standard of Review

AEDPA's express terms limit its application to claims that have been adjudicated on the merits by a state court. *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006) (citations omitted). When a claim has been "adjudicated on the merits in State court proceedings," AEDPA restricts the availability of federal habeas relief to two circumstances. 28 U.S.C. § 2254(d). First, habeas relief is available when a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). And second, habeas relief is available when a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). Only when fair-minded jurists could not disagree that a state court's merits decision conflicts with Supreme Court precedent may a federal court issue a writ of habeas corpus. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). When there has been no such adjudication on the merits, however, "AEDPA's deferential standard of review does not apply." *Williams*, 460 F.3d at 796 (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

We review a district court's decision to dismiss a habeas petition de novo, *Awkal*, 613 F.3d at 638, but typically review any factual findings by the district court for clear error, *Sherwood v. Prelesnik*, 579 F.3d 581, 584 (6th Cir. 2009). However, where, as here, the district court does not itself conduct an evidentiary hearing and relies instead exclusively on the state-court record, we review the district court's factual findings de novo. *See Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

## 2. Adjudication on the Merits

Under *Harrington v. Richter*, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary." 131 S. Ct. at 784–85. Yet this presumption is not, as the *Richter* Court made clear, irrebuttable: "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 131 S. Ct. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Our recent decision in *McCarley v. Kelly*, 759 F.3d 535 (6th Cir. 2014), provides some guidance on what factors we should take into account in determining whether or not this presumption has been overcome. These factors include, among others, the language used by the state court in its discussion of the claim at issue and the context of that discussion when the state court's opinion is "read as a whole." *Id.* at 543–44.

In *McCarley*, for instance, we looked to the opinion of the Ohio Court of Appeals, the last state court to issue a reasoned decision addressing McCarley's Sixth Amendment claim. We determined that that decision was not entitled to AEDPA deference, because (1) "the state court did not issue a decision as to whether the State violated McCarley's Sixth Amendment rights; rather, it made a point of *not deciding* the issue," and (2) "when read as a whole, it is clear [from the state-court opinion] that the state court was not convinced that McCarley's claim lacked merit." *Id.* at 543 (emphasis in original).

This case is of a piece. Here, the Ohio Court of Common Pleas made clear that, "[b]y not raising any *Brady* issues on direct appeal, *the defendant is barred from raising this issue here*," a classic example of applying a procedural bar to the matter at hand. R. 11-2 (Ohio Ct. of Common Pleas Decision and Entry Den. Def.'s Pet. For Post-Conviction Relief 3) (Page ID #614) (emphasis added). The Ohio Court of Appeals affirmed, reiterating that, because "appellant did not raise any *Brady* issues on direct appeal . . . appellant is barred from raising any *Brady* issues in this postconviction relief proceeding." R. 11-2 (Ohio Ct. of Appeals Op. Affirming Decision to Den. Def.'s Pet. For Post-Conviction Relief 6) (Page ID #741). Again, instead of issuing a merits decision, both the Ohio Court of Common Pleas and the Ohio Court of

Appeals made clear that they were applying a procedural bar and thus not considering the merits of Barton's *Brady* claim. The Supreme Court has held, in decisions issued post-*Richter*, that such rulings are not subject to on-the-merits AEDPA deference. *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was adjudicated *on the merits* in State court.") (emphasis in original) (internal quotation marks omitted).

To be sure, when a state court makes clear that it is deciding a claim both on the merits and on procedural grounds, we have held that a federal habeas court may nonetheless review that court's merits analysis and, if appropriate,[5] apply AEDPA deference to that adjudication. *See, e.g., Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008). And, in this case, the state trial court did, in dicta, appear to consider some of the substantive aspects behind Barton's claim. After having determined that Barton was "barred from raising this issue" in post-conviction relief, for instance, the state trial court nonetheless went on to note that it "ha[d] *strong reservations* as to what limited relevant evidence would have been admitted had the defense attempted to raise the matter at trial." R. 11-2 (Ohio Ct. of Common Pleas Decision and Entry Den. Def.'s Pet. For Post-Conviction Relief 3) (Page ID #614) (emphasis added).

This offhand remark cannot be taken as an adjudication on the merits, especially when considered alongside the state trial court's *unambiguous* statement that Barton's claim had been procedurally defaulted. Indeed, the trial court does not conclude that Barton's *Brady* claim failed on the merits. Instead, the trial court remarks only that it has "strong reservations" as to the evidence's ultimate relevance at trial. That observation is nearly identical to language used by the state court in *McCarley*, where the Ohio Court of Appeals "simply 'note[d]' its 'doubt' as to the claim [in question] without further discussion of the Confrontation Clause." 759 F.3d at 543 (first alteration in original). The state trial court's other statement—that "[j]ust because Mr. Kelley [sic] denies any part in such a plot, does not mean that the jury here would have believed him or that the jury would not have found a ring of truth in the similarity between the two stories," R. 11-2 (Ohio Ct. of Common Pleas Decision and Entry Den. Def.'s Pet. For Post-Conviction Relief 3) (Page ID #614)—is likewise unclear. These remarks simply entertain what

---

[5]The state court must actually decide petitioner's claim on the merits rather than simply assume without deciding. *See Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

might (or might not) have happened at trial, without the court definitively issuing a ruling on the merits.

To summarize: although we recognize the importance of according deference to the rulings of our state-court brethren, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011), we also recognize that such deference may, in certain cases, be inappropriate. That is especially true where, within the habeas context, "there is reason to think some other explanation for the state court's decision is more likely" than an on-the-merits adjudication. *Richter*, 131 S. Ct. at 785. Here, both the state trial court and the state court of appeals indicated, unambiguously, that they were issuing a decision grounded in procedural principles—namely, that Barton was barred from raising his *Brady* claim in post-conviction relief because he had failed to raise it initially on direct appeal. The state trial court's cursory discussion of the merits of Barton's claim—a discussion where the court appeared to go back and forth on the claim's merits without resolution—simply cannot be accorded AEDPA deference.

### 3. Last Reasoned Decision

Even if we were to consider the state trial court's decision as both a procedural ruling and a ruling on the merits, however, we would still need to review Barton's claim de novo, because we would be bound by another Supreme Court decision—*Ylst*. In *Ylst*, petitioner Nunnemaker raised a *Miranda* claim in both his direct appeal and in his petition for collateral relief. *Ylst v. Nunnemaker*, 501 U.S. at 799–800. His petition for collateral relief was denied without opinion by the California Superior Court, the California Court of Appeal, and the California Supreme Court. *Id.* at 800. The California Court of Appeal issued the last reasoned opinion in Nunnemaker's case, on direct appeal. There, the state court of appeal affirmed his conviction, relying on "the state procedural rule that an objection based upon a *Miranda* violation cannot be raised for the first time on appeal" as "[t]he sole basis for its rejection of [Nunnemaker's] *Miranda* claim." *Id.* at 799. Although Nunnemaker insisted that the state courts' subsequent denials of his petition for collateral relief "lifted the procedural bar arising from the [California Court of Appeal's] decision on direct review," *id.* at 801, the Supreme Court disagreed. Instead, the Court instructed federal courts to "look through" and defer to the "last reasoned state-court opinion" that addressed the matter. *Id.* at 804. Thus, "where, as here, the last reasoned opinion

on the claim explicitly imposes a procedural default, [the federal courts must] presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Id.* at 803.

Applied to this case, this rule requires us to examine the reasoning behind the decision of the Ohio Court of Appeals, not the decision of the Ohio Court of Common Pleas. The decision of the Ohio Court of Appeals expressly declined to adjudicate Barton's claim on the merits, opting instead to apply Ohio's res judicata doctrine. Under *Ylst*, this "last *explained* state-court judgment" governs. *Id.* at 805 (emphasis in original).

In arriving at this conclusion, we rely entirely on the Supreme Court's decision in *Ylst*. However, we observe in passing that our own case law and precedent from our sister circuits are in accord. In *Payne v. Bell*, 418 F.3d 644 (6th Cir. 2005), for example, petitioner also raised a *Brady* claim for the first time in post-conviction relief. The Shelby County Criminal Court considered the claim on the merits and issued an order denying the petition for post-conviction relief, which the Tennessee Court of Criminal Appeals affirmed. *Id.* at 652. The Tennessee Supreme Court denied further review. *Id.* On review before our court, we examined the decision not of the Shelby County Criminal Court nor the Tennessee Supreme Court, but of "[t]he Tennessee Court of Criminal Appeals, the last state court to issue a reasoned opinion on the issue," and ultimately determined that its "affirmance was not an unreasonable application of clearly established federal law." *Id.* at 660–61.

We have cited and applied *Ylst* in a number of other cases. *See Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014) ("We review the decision of the last state court to issue a reasoned opinion on the issues raised in a habeas petition.") (internal quotation marks and emphasis omitted); *Haliym v. Mitchell*, 492 F.3d 680, 691 (6th Cir. 2007) ("[I]n determining whether a claim is procedurally defaulted, this Court must look to the last *explained* state court judgment."); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991) ("Where the last explained state court judgment rejected petitioner's claims on procedural grounds, the presumption [that a later unexplained decision rested on the same grounds] is rebuttable *only* where the petitioner adduces strong evidence that one of the *subsequent* courts reached the merits of the federal claim.") (internal quotation marks and citation omitted) (emphasis added).

The last-reasoned-decision rule also applies separately to each claim within a case. In *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006), we applied the rule separately to each of Joseph's claims, finding that some of them (e.g., sufficiency of the evidence) required us to review the Ohio Supreme Court's decision, while others (e.g., prosecutorial misconduct) required us to review the Ohio Court of Appeals' decision. *Id.* at 450. However, we must still defer to the last reasoned state-court *opinion*, rather than try to string together a series of state *opinions* piecemeal *for each claim*.[6] As the Supreme Court made clear in *Ylst*, the core purpose of this rule is to improve "administrability" and "accuracy" amongst the lower federal courts. *See Ylst*, 501 U.S. at 803; *see also Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("[T]he Supreme Court describes AEDPA review as applying to a single state court decision, not to some amalgamation of multiple state court decisions."). These objectives are contravened when a court attempts to combine various state-court decisions together for purposes of reviewing a single claim. Indeed, we have reviewed a single state-court decision to evaluate each of petitioner's claims in a number of habeas cases. *See, e.g., Joseph*, 469 F.3d at 450; *Loza*, 766 F.3d at 474, 486 (examining some of Loza's claims by reviewing decision of the Ohio Supreme Court on direct appeal and examining other claims by reviewing decision of the Ohio Court of Appeals on post-conviction review).

As a final point, we observe that our conclusion in this case is also supported by decisions from our sister circuits. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009) (finding that lower state-court decision was not subject to AEDPA deference, noting that "the Pennsylvania Supreme Court decided Thomas' claims on purely procedural, not substantive grounds. This decision stripped the PCRA court's substantive determination of Thomas' claims

---

[6]This appears to be how this court handled a *Joseph*-style review of petitioner's ineffective-assistance claims in *Hoffner v. Bradshaw*, 622 F.3d 487 (6th Cir. 2010). However, the *Hoffner* court made clear that its analysis was to be treated as dicta. After reviewing the claim's procedural history, the *Hoffner* court discussed our circuit's test for procedural default. 622 F.3d at 504. It then applied this test, "conclud[ing] that Hoffner ha[d] procedurally defaulted his claims of ineffective assistance of appellate counsel. *Nevertheless*, even if Hoffner's claims were not defaulted, each [would] fail[] on the merits." *Id.* at 595 (emphasis added). The court then undertook a brief merits analysis. *Cf. Wellons v. Hall*, 130 S. Ct. 727, 730 (2010) (remanding case to Eleventh Circuit because "[h]aving found a procedural bar, the Eleventh Circuit had no need to address whether petitioner was otherwise entitled to an evidentiary hearing and gave this [merits] question, at most, perfunctory consideration."). Thus, we do not follow *Hoffner*'s dicta and instead rely on the Supreme Court's holding in *Ylst* in finding that the last reasoned decision rejected Barton's *Brady* claim on procedural grounds and did not adjudicate it on the merits.

of preclusive effect."); *Barker*, 423 F.3d at 1093 ("Thus, even when one state court adhered to federal law, if the last court to review the claim erred, the federal court should review the last decision in isolation and not in combination with decisions by other state courts."); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (declining to apply AEDPA deference to state trial court merits decision when state appellate court decided claim solely on procedural grounds).

To summarize, while AEDPA requires us to defer to the state courts in situations where they have adjudicated an issue on the merits, no such adjudication was issued here. Although the state trial court discussed *some* of the substantive aspects behind Barton's *Brady* claim, it did not ultimately arrive at a definitive conclusion, relying instead on a procedural bar to dispose of the claim at hand. Even if this discussion by the state trial court were considered an adjudication on the merits, it would have been stripped of any preclusive effect under the last-reasoned-decision rule, as developed and applied in *Ylst*, *Haliym*, and *Payne*. The last reasoned decision here was issued by the Ohio Court of Appeals on Barton's petition for post-conviction relief, and was entirely based on a procedural bar. Thus, as noted above, we review Barton's claim de novo.

## B. Procedural Default

Before taking up Barton's claims on the merits, we are mindful that "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (adopting "cause and prejudice" standard).

We have developed a four-part test to determine whether we are precluded from reviewing a federal habeas claim because the petitioner failed to observe a state procedural rule. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986) (stating test); *Landrum v. Mitchell*, 625 F.3d 905, 916–17 (6th Cir. 2010) (applying test to claim after enactment of AEDPA). That test requires us first to determine whether "there is a state procedural rule that is applicable to petitioner's claim and that the petitioner failed to comply with the rule." *Maupin*, 785 F.2d at 138. Second, we "must decide whether the state courts actually enforced the state procedural

sanction." *Id.* Third, we "must decide whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Id.* And finally, "the petitioner must demonstrate under *Sykes* that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.*

The first three prongs of *Maupin* are easily met here. The Ohio Court of Appeals applied res judicata to determine that Barton was barred from raising his *Brady* claim in post-conviction proceedings. This doctrine, as we have held in other cases, is "a procedural bar" that "is regularly applied by the Ohio courts." *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001). Moreover, the state courts enforced this procedural rule against Barton. And our case law also makes clear that "*res judicata* is an adequate and independent state ground for barring habeas review of constitutional claims." *Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004).

Finally, as we discuss in greater detail below, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). As the Supreme Court has pointed out, the final element in the *Maupin* analysis—"cause and prejudice"—"parallel[s] two of the three components of the alleged *Brady* violation itself." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation marks and citation omitted); *see also id.* ("Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes."). Accordingly, because Barton has satisfied the first three elements of *Maupin*, we proceed to an analysis of his claim on the merits.

**C. Analysis of Barton's *Brady* Claim**

    **1. Exculpatory or Impeachment Evidence Favorable to Barton**

The evidence here came to light when the police re-opened a burglary investigation that had been dormant for over a decade, just as the prosecution team was gathering evidence in its case against Barton. Although police detectives interviewed Jim, Ann, and Becky Kelly, none of the Kellys' statements appear to have been written down. According to Ann and Becky, detectives threatened to bring obstruction-of-justice charges against Jim unless he testified against Barton at trial. R. 11-2 (Ann Kelly Affidavit at 2) (Page ID #579); R. 11-2 (Becky Kelly Affidavit at 2) (Page ID #581). Jim, however, has since died, thereby forcing us to rely solely on Ann's and Becky's affidavits to substantiate these claims. There is, moreover, no evidence that the police relayed the substance of their conversations to the prosecutors in *Barton*. We must thus address the question of whether these statements, known to the police but unrecorded, can properly be considered *Brady* evidence.

We answer in the affirmative. We begin by recognizing that, under Supreme Court precedent, whether the police actually informed the prosecutors of their conversations is immaterial. The Supreme Court has held that prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police*." *Kyles*, 514 U.S. at 437 (emphasis added). In addition, we also note that *Brady* is not a hard and fast evidentiary rule. To be sure, evidence that could have "no direct effect on the outcome of trial" cannot be considered *Brady* material. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (finding that polygraph results could not be considered *Brady* material when those results would not have been admissible under state law). However, inadmissible material might nonetheless be considered "material under *Brady* if it would 'lead directly' to admissible evidence." *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012) (quoting *Sawyer v. Hofbauer*, 299 F.3d 605, 614 (6th Cir. 2002)); *see also Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003); 6 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 24.3(b) (3d ed. 2007) ("Most courts now view admissibility as a critical end-product, but note that the duty to disclose could encompass inadmissible information where that information appears likely to lead the defense to the discovery of admissible evidence."); Brian D. Ginsberg, *Always Be Disclosing: The*

*Prosecutor's Constitutional Duty to Divulge Inadmissible Evidence*, 110 West Virginia Law Review 611, 626–634 (2008) (reviewing *Brady* and post-*Brady* Supreme Court cases and concluding that "the Court's opinions in its *Brady* line of cases contemplate that constitutional criminal discovery encompasses inadmissible evidence.").

Although the Kellys' unrecorded statements might have been inadmissible hearsay, disclosure of the substance of these statements might have led directly to admissible evidence. Barton might have, for instance, called Jim Kelly to take the stand at trial to testify in Barton's favor, thereby putting into question Henson's bias, self-interest, and motive to lie. During trial, the State questioned Henson at length about his prior experiences as a burglar for hire. The State thus opened the door for Barton to impeach Henson, either on cross-examination or by calling another witness to the stand. *See, e.g.*, Ohio Evid. R. 616(A) ("Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by *examination of the witness or by extrinsic evidence.*") (emphasis added); *see also United States v. Tavera*, 719 F.3d 705, 713–14 (6th Cir. 2013) (finding *Brady* violation when prosecutors decided not to relay statements made by co-defendant in initial plea-debriefing session); *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc) (concluding that existence of "less formal, unwritten, or tacit agreement is also subject to *Brady*'s disclosure mandate").

On a related note, we also acknowledge—and reject—the State's assertion that the evidence at issue was inculpatory rather than exculpatory. According to John Newsom, an officer in the Warren County Sheriff's Office, Kelly's denial was "not exculpatory. In my experience, people often stick to the original story which they provide to the police, even if it turns out to be a lie. Thus, I would not consider it material that Mr. Kelly was sticking to the original story that the burglary at his home was legitimate." R. 11-2 (Newsom Affidavit at 2) (Page ID #672). In fact, according to Newsom, "the information regarding the Kelly burglary was, in many aspects, inculpatory because it substantiated Henson's story." *Id.* at 3 (Page ID #673).

It is worth analyzing what sort of evidence, in Newsom's view, would or could have been considered exculpatory. As it stands, the police found Kelly's denials not only to be insufficiently exculpatory, but actually inculpatory. Yet, had Kelly "confessed" to the police, his

statement would have certainly been considered inculpatory. The State would, then, have us fall into a sort of inculpatory Catch-22—anything Kelly could say would have been inculpatory in the police's view. This invitation we decline. The purpose of *Brady* and its progeny is to enforce an independent duty upon the State to hand over all of the material exculpatory evidence that it collects. It is not for the State to weigh the evidence and decide what the jury would ultimately find to be material and exculpatory—that is something that the jury itself must decide. And, as we discuss below, we believe that "there is a reasonable probability that, had the evidence [in question] been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012).

## 2. Willful or Inadvertent Suppression of Evidence by the State

The second component of our *Brady* analysis—willful or inadvertent suppression of evidence—dovetails with our inquiry into "cause," as part of our procedural-default analysis. *See also Jamison v. Collins*, 291 F.3d 380, 386 (6th Cir. 2002) ("In order to show cause, [the petitioner] must provide a substantial reason for the default that is external to him."); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials,' made compliance impracticable, would constitute cause under this standard.") (citations omitted).

We begin our analysis by looking to language in *Strickler v. Greene*, 527 U.S. 263 (1999), which instructs us to examine three factors in determining whether a petitioner has shown cause for his failure to raise a *Brady* claim in state court: whether "[t]he documents [in question] were suppressed by the [state]," whether "the prosecutor maintained an open file policy," and whether "trial counsel were not aware of the factual basis for the claim." *Id.* at 283; *see also Banks*, 540 U.S. at 692–93 (citing and applying *Strickler* factors).

This case is on all fours with *Strickler*. Barton's counsel requested that the State turn over all *Brady* material, including a specific request that it turn over "any and all information tending to or likely to lead to information tending to impeach the character of any witness intended to be called by the Government." R. 11-1 (Def.'s Mot. to Dismiss Indictment at 7)

(Page ID #64).   The State indicated that it would "fully comply" with this request.   R. 11-1 (Response to Def.'s Mot. to Dismiss Indictment at 4) (Page ID #81).   Yet the State clearly did not do so.   In fact, its inaction resulted in Barton's inability to present his claim at trial and on direct appeal.

As recounted above, police officers re-opened their investigation into the Kelly burglary after Barton's indictment but before Barton's trial.   These officers gathered extensive evidence indicating that the Kelly burglary was not staged and was not intended to scare the Kelly family into moving to the city, contrary to Henson's allegations.   They had conversations with Jim, Ann, and Becky Kelly, with each member giving a consistent account—and an account that was inconsistent with Henson's.   Yet, in the end, authorities placed only a single police report into the *Brady* file that they turned over to Barton.   That report was more than a decade old and lacked any mention of Henson, much less any mention that the burglary was staged with a near-identical motive to the one that allegedly occurred in Barton's case.   In other words, at no point did the State provide Barton with *any* updated information from its 2004 reinvestigation.

The State has insisted that Barton could have uncovered this evidence on his own, because he was given a copy of the police report that included details of the Kelly burglary and contact information for Becky Kelly.   We are unconvinced.   Nothing in the report mentions that the burglary might have been staged.   Instead, the "Narrative" section focuses on summarizing Becky Kelly's eyewitness account—an account that is remarkably consistent with the one she gave in an affidavit more than ten years later.   *See* R. 11-2 (Kelly Police Report at 2–6) (Page ID #677–81); R. 11-2 (Becky Kelly Affidavit at 1–2) (Page ID #580–81).   It is difficult for us to understand how Barton would have been able to (or should have been expected to) connect the dots between his wife's murder, Gary Henson, and the Kelly burglary.

In any event, we emphasize that this is not the purpose of *Brady*.   In fact, it is the very opposite of the purpose of *Brady*.   "The presumption, well established by tradition and experience, [is] that prosecutors have fully discharged their official duties."   *Strickler*, 527 U.S. at 286 (internal quotation marks and citation omitted).   These duties, of course, include complying with *Brady*.   At no point have we or the Supreme Court offered any "support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the

prosecution represents that all such material has been disclosed." *Banks*, 540 U.S. at 695; *see also Strickler*, 527 U.S. at 282–89 (rejecting broad due-diligence requirement). To reiterate: *Brady* requires the State to turn over *all* material exculpatory and impeachment evidence to the defense. It does not require the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.

### 3. Prejudice to Barton

Third, we must determine whether the information withheld from Barton was material and prejudicial to his defense. Our inquiry here is guided by the reasonable-probability standard. This standard "does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial." *Smith*, 132 S. Ct. at 630 (internal quotation marks and citation omitted).

In finding the evidence at issue immaterial, the magistrate judge's supplemental report stated that such evidence "would have been at best further gilding of the lilly [sic]. Defense counsel impeached Henson by getting him to admit many prior convictions, including for falsification offenses . . . . [Henson] admitted on the stand that he had lied to investigators about this very crime. And still the jury believed him. It is extremely doubtful that the Kelly information would have tipped the balance." R. 49 (Magistrate Judge's Supplemental Report and Rec 6–7) (Page ID #2493–94).

We disagree. The evidence at issue is not cumulative or superfluous to the other impeachment evidence that was levied against Henson. Rather, it goes to the heart of the State's theory of the case: that Barton hired Phelps and Henson to stage a burglary at his house to scare his wife into moving to the city. Consider what the jury would have had to believe if Kelly had actually testified in Barton's favor: that, in the span of two years, two farm owners, living in the same Ohio county, decided—separately—that they both wanted to move to the city; and decided—again, separately—that they could convince their families to do so only by staging a home burglary; and decided—once again, separately—that they would hire the same two-man team to stage this burglary. The jury would have had to believe that Henson (and the State) were telling the truth, despite vehement denials by Barton and every member of the Kelly family. The

jury would have had to contend with the fact that the Kellys continue to live on their farm in Warren County, more than twenty years after Jim supposedly sought to frighten them into moving to the city. We believe that the evidence here would have done more than simply raise general questions about Henson's character. It would have addressed whether Henson was telling the truth in this specific instance. *See, e.g.*, *Banks*, 540 U.S. at 702 ("The State argues that Farr was heavily impeached [at trial], rendering his informant status merely cumulative. The record suggests otherwise. Neither witness called to impeach Farr gave evidence *directly relevant* to Farr's part in Banks's trial.") (first alteration in original) (emphasis added) (internal quotation marks and citations omitted); *Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) (rejecting State's contention that "undisclosed impeachment information would have been merely cumulative" because "the undisclosed information was different in kind.").

In finding that Barton has demonstrated a reasonable probability of prejudice, we follow the Supreme Court's decisions in *Smith* and *Banks*. In each of these cases, the prosecution relied on a single witness for its theory of the case. In *Smith*, the key witness, Boatner, "identified Smith as the first gunman to come through the door. He claimed that he had been face to face with Smith during the initial moments of the robbery." 132 S. Ct. at 629. Yet, during his post-conviction relief proceedings, Smith "obtained files from the police investigation of his case," including a report from the State's lead investigator which revealed that Boatner "could not identify any of the perpetrators of the murder" in a conversation with the police on the night of the murder. *Id.* at 629–30. In concluding that the State had improperly withheld evidence under *Brady*, the Supreme Court took note that "Boatner's testimony was the *only* evidence linking Smith to the crime," with the State presenting "[n]o other witnesses and no physical evidence implicat[ing] Smith." *Id.*

Similarly, in finding that petitioner had shown both cause and prejudice in *Banks*, the Supreme Court contrasted the facts of that case to those in *Strickler*, where the Court found cause, but not prejudice. The *Banks* Court noted that "[t]he witness whose impeachment was at issue in *Strickler* gave testimony that was in the main cumulative," because "considerable forensic and other physical evidence link[ed] [the defendant] to the crime." 540 U.S. at 700–01.

Farr's testimony in *Banks*, on the other hand, was entirely "uncorroborated by any other witness" and unsupported by any other evidence. *Id.* at 700.

Our own precedent is in accord with these decisions. In *Robinson v. Mills*, 592 F.3d 730 (6th Cir. 2010), prosecution witness Sims was the single eyewitness to a homicide. She gave a dramatically different account of events at Robinson's trial than at Robinson's preliminary hearing. *Id.* at 736. We found evidence of a *Brady* violation similar to that in *Smith* and reiterated the importance of admitting impeachment evidence where the government's case rests on the testimony of a single witness. *Id.* In *Harris v. Lafler*, 553 F.3d 1028, 1030–31 (6th Cir. 2009), the State withheld evidence that the police had offered to release witness Ward and Ward's girlfriend if he chose to testify against Harris. In determining that the State had committed a *Brady* violation, the *Harris* court took note that Ward's testimony "was the *only* piece of eyewitness evidence that directly linked Harris to the shooting . . . and there was no forensic or physical evidence connecting Harris to the crime." *Id.* at 1033 (emphasis in original). The defendant, we continued, "suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness." *Id.* at 1034.

Like the cases described above, the State's theory here rests on the testimony of a single witness—not even an eyewitness, in fact. That witness presented an unsupported, shifting, and somewhat fantastical story at trial. The State suppressed material, exculpatory evidence from Barton, thereby making it more difficult for Barton to discredit this theory. There is a reasonable probability that such actions affected the outcome of the trial.

### III. CONCLUSION

For the reasons stated above, we **REVERSE** the judgment of the district court and **CONDITIONALLY GRANT** Barton's petition for a writ of habeas corpus, unless the State retries Barton within six months.